UNITED STATES of America, Appellee,

v.

William R. TIBOLT, Defendant, Appellant.

No. 94–2221.

United States Court of Appeals, First Circuit.

Heard May 1, 1995.

Decided Dec. 29, 1995.

Anthony M. Cardinale, Boston, MA, with whom Nicholas J. DiMauro, North Reading, MA, and Law Offices of Anthony M. Cardinale, Boston, MA, were on brief, for appellant.

William C. Brown, Attorney, Appellate Division, Department of Justice, with whom Donald K. Stern, United States Attorney, Boston, MA, was on brief, for appellee.

Before SELYA, Circuit Judge, COFFIN, Senior Circuit Judge, and CYR, Circuit Judge.

CYR, Circuit Judge.

Following his conviction on a money laundering charge, 18 U.S.C. § 1956, in the United States District Court for the District of Massachusetts, William Tibolt appeals two trial court rulings relating to incriminating financial records seized from his residence in a warrantless search. Finding no error, we affirm.

# I

## *BACKGROUND*

Around mid-morning on July 27, 1992, a security alarm activated in the Dombrowski residence located at 13 Old Salem Path in Gloucester, Massachusetts. As the security alarm company—JK Security—was unable to make telephone contact with the Dombrowski residence to determine whether the alarm had been set off accidentally, it telephoned the Gloucester Police to report the alarm. Officer Joseph Palazzola was dispatched to investigate the alarm report at the Dombrowski residence, which is next door to the Tibolt residence at 11 Old Salem Path.

Both residences are set well back from Old Salem Path and largely concealed from view. Two driveways—separated by a tree and some shrubbery—lead to the Tibolt home. The Tibolt mailbox—bearing "11 Old Salem Path"—is located immediately to the right of the first Tibolt driveway. The Dombrowski mailbox—marked "dombrowski 13"—is located a few feet left of the second Tibolt driveway, *more than 60 feet before* the driveway entrance to the Dombrowski residence at 13 Old Salem Path.

Upon observing the mailbox marked "13," Officer Palazzola mistakenly entered the second driveway to the Tibolt residence. He checked the exterior of the residence for signs of an attempted break, or burglary in progress. Although he noted no signs of forced entry, Palazzola found an unlocked door on the rear deck. He opened the door and called inside to alert any occupant, but received no response. Given that the police had been requested to investigate the alarm, that a door was unlocked, and that Palazzola had been unable to make contact with anyone inside the house, he reasoned that the alarm might not have been activated accidentally.

Palazzola promptly called for backup, and Officer Thomas Williams arrived within five minutes. Williams likewise drove to the Tibolt residence rather than the Dombrowski residence, because he saw Palazzola's squad car parked next to the Tibolt residence. Williams immediately recognized the Tibolt residence as having been the target of a prior investigation by a Gloucester Police drug task force in which he had participated. Williams was unsure, however, whether the target (viz., Tibolt) of the task force investigation still owned the residence, or whether it was still under investigation for drug-related activities.

Palazzola and Williams decided to make an immediate warrantless entry through the unlocked rear door, then looked about for possible explanations for the alarm (e.g., any occupants, a burglar, "whatever"). Their search was limited in scope, eschewing drawers, cabinets and containers. The officers "secured" each room, to rule out the presence of intruders, captives, or injured occupants. After sweep-searching the upper floors, the officers discovered a well-established marijuana growing facility in the basement, then left to obtain a search warrant.[1] Later, armed with

---

1. The warrant application related the following grounds: (1) an intrusion alarm was reported by J.K. Systems to the Gloucester Police Department; (2) Officers Palazzola and Williams re-

a warrant, the officers searched the Tibolt premises and seized incriminating financial records which Tibolt subsequently sought to suppress on the ground that the search warrant was invalid because the evidence relied on in the supporting affidavit was itself the fruit of the earlier warrantless search. After hearing, the district court denied the motion to suppress, without elaboration.

Following the verdict, Tibolt moved for a new trial on the ground that he had uncovered "new" evidence relating to the suppression motion which would (1) impeach Palazzola's suppression hearing testimony, (2) suggest that the Gloucester Police deliberately planned to search the Tibolt residence, and (3) demonstrate a *Franks v. Delaware*, 438 U.S. 154, 155–56, 98 S.Ct. 2674, 2676–77, 57 L.Ed.2d 667 (1978), violation. Gloucester Police Department "incident cards," which record the time, date, desk officer, and location of police assignments, disclosed that officers had been called to Old Salem Path on at least fourteen prior occasions to investigate security alarms. The cards reflect that there were three calls to "13 Old Salem Path" and ten others to "Old Salem Path." One card, dating from 1990, indicates that Officer Joseph Palazzola had been sent to the Dombrowski residence to investigate a security alarm. And two cards indicate that a desk officer with the initials "J.P." had dispatched other officers to "Old Salem Path." In addition, an affidavit by Officer Theodore Lemieux, dated January 27, 1994—*the day after the Tibolt suppression hearing*—and submitted in support of a search warrant application in an *unrelated* criminal proceeding, stated that

> an informant ... has provided information that led to the arrest and indictment of one William Tibolt. In the investigation the informant provided detailed information in regard to the location of an indoor growing operation that Mr. Tibolt had in his home. The informant provided the name, address as well as other persons that were involved in the marijuana growing operation. The informants [sic] also described the home and the interior as well

as a room in the center of the basement that [sic] the growing operation was being conducted. (Emphasis added.)

But for the fact that it contains no indication as to the timing of the events described in it, the Lemieux affidavit might conflict with the affidavit submitted in support of the search warrant application of July 27, 1992, *see supra* note 1, which described JK Security's call to the Gloucester Police Department, the police response, and the officers' *unexpected* discovery of marijuana in the Tibolt basement. After hearing, the district court denied the motion for new trial. *United States v. Tibolt*, 868 F.Supp. 380, 381–83 (D.Mass. 1994).

## II

### DISCUSSION

#### A. Motion to Suppress

Tibolt first challenges the district court's *pretrial* denial of the motion to suppress the primary evidence of money laundering: the financial records seized from his residence on July 27, 1992. He contends that there was no objectively reasonable basis for believing that a life-threatening burglary was in progress, even assuming that Officer Palazzola reasonably had mistaken the Tibolt residence for the Dombrowski residence. *But see infra* Section II.B. And he argues that inspection of the exterior of the Tibolt residence revealed no signs of forcible entry, and no open windows or doors. *See* Brief for Appellant at 27–29 (citing *United States v. Erickson*, 991 F.2d 529 (9th Cir.1993) (suppressing evidence seized in warrantless search of residence where officers investigating burglar alarm observed no indication of forced entry)).

#### 1. Substantive Law

■■■ A warrantless search of a private residence is presumptively unreasonable under the Fourth Amendment. *See Payton v. New York*, 445 U.S. 573, 586, 100 S.Ct. 1371, 1380, 63 L.Ed.2d 639 (1980). The government therefore must prove that the initial search came within some recognized excep-

---

sponded to the alarm report and found a door open; (3) the officers entered the home to check

the premises for intruders; and (4) a marijuana-growing facility was found in the cellar.

tion to the Fourth Amendment warrant requirement. *See United States v. Doward*, 41 F.3d 789, 791 (1st Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 1716, 131 L.Ed.2d 575 (1995). Generally speaking, absent probable cause and exigent circumstances the Fourth Amendment bars warrantless, nonconsensual entries of private residences. *See United States v. Curzi*, 867 F.2d 36, 41 (1st Cir. 1989).[2]

■ Probable cause will be found to have been present if the officers at the scene collectively possessed reasonably trustworthy information sufficient to warrant a prudent policeman in believing that a criminal offense had been or was being committed. *See Hegarty v. Somerset Cty.*, 53 F.3d 1367, 1374 (1st Cir.1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 675, 133 L.Ed.2d 524 (1995); *United States v. Zurosky*, 614 F.2d 779, 784 n. 2 (1st Cir.1979) (finding probable cause where police investigated possible "breaking and entering" at warehouse), *cert. denied*, 446 U.S. 967, 100 S.Ct. 2945, 64 L.Ed.2d 826 (1980) (citing *Brinegar v. United States*, 338 U.S. 160, 175–76, 69 S.Ct. 1302, 1310–11, 93 L.Ed. 1879 (1949)). "In dealing with probable cause, . . . as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." *Illinois v. Gates*, 462 U.S. 213, 231, 103 S.Ct. 2317, 2328–29, 76 L.Ed.2d 527 (1983).

■ Exigent circumstances exist where law enforcement officers confront a "compelling necessity for immediate action that w[ould] not brook the delay of obtaining a warrant." *United States v. Wilson*, 36 F.3d 205, 209 (1st Cir.1994) (citing *United States v. Adams*, 621 F.2d 41, 44 (1st Cir.1980)); *United States v. Almonte*, 952 F.2d 20, 22 (1st Cir.1991), *cert. denied*, 503 U.S. 1010,

112 S.Ct. 1776, 118 L.Ed.2d 434 (1992). Although "exigency" determinations invariably are fact-intensive, *see United States v. Donlin*, 982 F.2d 31, 34 (1st Cir.1992), "exigent circumstances" commonly include: "(1) 'hot pursuit' of a fleeing felon; (2) threatened destruction of evidence inside a residence before a warrant can be obtained; (3) a risk that the suspect may escape from the residence undetected; or (4) a threat, posed by a suspect, to the lives or safety of the public, the police officers, or to [an occupant]." *Hegarty*, 53 F.3d at 1374. The "exigent circumstances" inquiry is limited to the objective facts reasonably known to, or discoverable by, the officers at the time of the search. *See Illinois v. Rodriguez*, 497 U.S. 177, 186, 110 S.Ct. 2793, 2800, 111 L.Ed.2d 148 (1990) (upholding warrantless search where police officers reasonably, but mistakenly, believed they had obtained valid "third-party consent" to search residence from person with authority to consent) (citing *Archibald v. Mosel*, 677 F.2d 5 (1st Cir.1982) (invoking "good faith" principle under "exigent circumstances" exception)).

### 2. *Standard of Review*

■ As mixed questions of law and fact, the "probable cause" and "exigent circumstances" determinations require bifurcated review: whether a particular set of circumstances gave rise to "probable cause" or "exigent circumstances" is reviewed *de novo* and findings of fact are reviewed for clear error. *United States v. Goldman*, 41 F.3d 785, 786 (1st Cir.1994) (probable cause), *cert. denied*, —— U.S. ——, 115 S.Ct. 1321, 131 L.Ed.2d 201 (1995); *United States v. Gooch*, 6 F.3d 673, 678 (9th Cir.1993) (exigent circumstances). Where, as here, there are no explicit factual findings, the record below is assessed in the light most favorable to the trial court ruling. *See United States v. Baldacchino*, 762 F.2d 170, 176 (1st Cir.1985).

---

**2.** The government would have us characterize this warrantless entry as a so-called "community caretaker" search, a warrant exception applicable to searches "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Cady v. Dombrowski*, 413 U.S. 433, 441, 447–48, 93 S.Ct. 2523, 2528, 2530–31, 37 L.Ed.2d 706 (1973). In light of our alternative disposition,

we need not consider the "community caretaker" exception. *But see id.* at 439, 93 S.Ct. at 2257 (noting "constitutional difference" between search of home and search of automobile); *see also United States v. Bute*, 43 F.3d 531, 535 (10th Cir.1994) (reading *Cady* as applying only to searches of automobiles, not homes); *Erickson*, 991 F.2d at 532 (same); *United States v. Pichany*, 687 F.2d 204, 209 (7th Cir.1982) (same).

### 3. *Application of Law*

■ Tibolt does not challenge the factual findings implicit in the district court ruling, given that the evidence most central to the ruling—the police descriptions relating to the alarm report, the locations of the mailboxes, the unlocked door—is undisputed.[3] Moreover, these implicit findings unquestionably support the challenged legal conclusion that Officer Palazzola had probable cause to believe a breaking and entering had been or was being committed at the Tibolt residence.

A security alarm had been activated, and when JK Security placed a call to the Dombrowski residence, it had received no answer.[4] These circumstances severely undercut any likelihood that the security alarm had been activated inadvertently by a resident. Moreover, upon his arrival *approximately ten minutes later*, Palazzola checked all windows and doors at the Tibolt residence.[5] Instead of finding all doors secured, as one might reasonably expect while the residents are away, he found an unlocked door on the rear deck and received no response to his efforts to communicate with anyone who might be inside. These circumstances significantly enhanced the likelihood of an intruder.

For similar reasons, we conclude that Palazzola was presented with "exigent circumstances" permitting an *immediate* warrantless entry. Without entering, he could not know but what an intruder had managed to get into the residence, and even injured or captured a resident, then fled; or had been caught off guard by the police and remained in the residence with a forcibly detained resident. Even the authorities cited by Tibolt acknowledge the potential exigencies attending such circumstances. *See Erickson*, 991 F.2d at 533 ("In a wide variety of contexts, this and other circuits have upheld warrantless searches conducted during burglary in-

---

3. On appeal, Tibolt asserts no direct challenge to the *objective* "reasonableness" of Palazzola's putative mistake—purportedly caused by the juxtaposition of the Dombrowski mailbox and the entrance to Tibolt's second driveway—in investigating the Tibolt residence, instead of Dombrowski's, for a burglary in progress. Rather, he questions only whether Palazzola, despite his protestations to the contrary, knowingly used this fortuitous circumstance as a pretext for conducting a warrantless search for drugs as part of an ongoing task force investigation targeting the Tibolt residence. The only evidence of such a ruse, however, was presented in his *post-conviction* motion. *See infra* Section II.B. At the *pretrial* hearing, the inquiry into Palazzola's state of mind necessarily turned, for the most part, on the trial court's observation of Palazzola's demeanor, and its credibility determination, matters uniquely within the province of the trier of fact. *United States v. Zapata*, 18 F.3d 971, 975 (1st Cir.1994).

4. Tibolt cites cases involving various external indicia of a "break," *see, e.g., Commonwealth v. Fiore*, 9 Mass.App.Ct. 618, 403 N.E.2d 953, 955 (upholding warrantless search where outer door found broken off hinges), *cert. denied*, 449 U.S. 938, 101 S.Ct. 336, 66 L.Ed.2d 160 (1980), *but no alarm system activation*. *See Erickson*, 991 F.2d at 530, 533 (noting that government, on appeal, had conceded that no "exigent circumstances" had been shown, given the absence of any activated security alarm; no visible sign of forced entry; witness reports that suspected burglars had departed area 30 minutes before police officers' arrival; and officers' failure to "knock and announce" before entry); *United States v.*

*Moss*, 963 F.2d 673, 677, 679 (4th Cir.1992) (invalidating search because "the Government has formally conceded that this is not an 'exigent-circumstances case' and does not seek to uphold the search here on that basis," given that police officer observed "no [external] indication that any illegal occupant was inside" the cabin); *Commonwealth v. Bates*, 28 Mass.App.Ct. 217, 548 N.E.2d 889, 892–93 (1990) (invalidating search where police did not even suspect an ongoing crime, but were merely investigating a "missing person" report, after waiting over three hours before investigating missing person's apartment); *State v. Morgavi*, 58 Wash.App. 733, 794 P.2d 1289, 1292–93 (1990) (invalidating search based on police observation of "a car in front of the garage, opened and partially broken doors to the garage, an open back door to the house and an open side door to the garage," but distinguishing cases where "the police were summoned to the premises by concerned neighbors who had witnessed the burglaries and the flight of suspects"). We think it clear that the activation of an alarm system is an external "sign" of a possible forced entry.

5. Although the Dombrowski residence bore a "JK Security" sticker, and the Tibolt residence an "ADT Security" sticker, there was no evidence that Palazzola had been informed by the dispatcher that JK Security had reported the alarm. Further, while dispatchers sometimes write the name of the reporting security company on the incident cards, *see infra* Section II.B., the investigating officers do not receive these cards for completion until *after* their investigation of the alarm report. In any event, Tibolt has not raised this matter. *See supra* note 3.

vestigations under the rubric of exigent circumstances."); *Commonwealth v. Fiore*, 9 Mass.App.Ct. 618, 403 N.E.2d 953, 955 ("It seems clear to us that a house break without more as set out in the affidavit raises the possibility of danger to an occupant and of the continued presence of an intruder and indicates the need to secure the premises. In such circumstances '(t)he right of the police to enter and investigate in an emergency without the accompanying intent to either search or arrest is inherent in the very nature of their duties as peace officers.' ") (citation omitted), *cert. denied*, 449 U.S. 938, 101 S.Ct. 336, 66 L.Ed.2d 160 (1980). Hindsight discloses, of course, that Palazzola was mistaken. Nevertheless, *at the time, see Rodriguez*, 497 U.S. at 186, 110 S.Ct. at 2800, an officer confronted with these circumstances reasonably could have concluded that there was an imminent risk "to the lives or safety of the public," *Hegarty*, 53 F.3d at 1374, or to an injured or immobilized resident. *See, e.g., Murdock v. Stout*, 54 F.3d 1437, 1443 (9th Cir.1995) (upholding warrantless search of residence following burglary report, where investigating officers found some signs that resident might have been at home when an intruder entered dwelling, and received no response to their calls, thereby creating a "fair probability that ... a resident might be in need of assistance") (distinguishing prior circuit precedent in *United States v. Erickson*, 991 F.2d 529 (9th Cir.1993)). Accordingly, the district court did not err in denying the motion to suppress.

## B. *Motion for New Trial*

We turn now to the district court ruling denying a new trial. Tibolt contends that the "newly discovered" Gloucester Police "incident cards" and the Lemieux affidavit support a rational inference that Officer Palazzola committed perjury at the suppression hearing, in explaining that the misleading placement of the Dombrowski mailbox at the opening of the second Tibolt driveway, and his own unfamiliarity with the two residences, had caused him to go to the Tibolt residence to investigate the reported alarm at the Dombrowski residence. Tibolt maintains that the incident cards show that Palazzola had been to the Dombrowski residence

at least once before and, therefore, should have recognized his mistake on this occasion. Further, he argues, the Lemieux affidavit suggests that Palazzola's "mistake" was actually part of an elaborate, conspiratorial ruse, manufactured by the Gloucester Police task force to enable a warrantless search of the Tibolt residence for drugs. *Cf. Curzi*, 867 F.2d at 43 n. 6 (noting that police may not justify warrantless search by manipulating events to generate "exigency"). Finally, in the affidavit supporting the search warrant application submitted on July 27, 1992—presumably premised *solely* on the fruits of the warrantless search—the police failed to disclose their prior investigations of the Tibolt residence for suspected drug activities. Tibolt insists that the failure to disclose the prior investigations of the residence constituted a "clear violation" of *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978).

### 1. *Substantive Law*

██ A motion for new trial based on newly discovered evidence will not be allowed unless the movant establishes that the evidence was: (i) unknown or unavailable at the time of trial, (ii) despite due diligence, (iii) material, and (iv) likely to result in an acquittal upon retrial. *United States v. Ortiz*, 23 F.3d 21, 27 (1st Cir.1994); *United States v. Natanel*, 938 F.2d 302, 313 (1st Cir.1991), *cert. denied*, 502 U.S. 1079, 112 S.Ct. 986, 117 L.Ed.2d 148 (1992). If, however, the "new" evidence was within the government's control and its disclosure was withheld, the third and fourth criteria are less stringent:

> The usual locution, taken from Justice Blackmun's opinion in [*United States v.*] *Bagley*, [473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985) ], is that the nondisclosure justifies a new trial if it is "material," it is "material" only if there is "a reasonable probability" that the evidence would have changed the result, and a "reasonable probability" is "a probability sufficient to undermine confidence in the outcome." *Id.* at 682 [105 S.Ct. at 3383].... This somewhat delphic "undermine confidence" formula suggests that [a] reversal [and a remand for new trial] might be warranted in some cases even if there is less than an

even chance that the evidence would produce an acquittal. After all, if the evidence is close and the penalty significant, one might think that undisclosed evidence creating (for example) a 33 percent chance of a different result would undermine one's confidence in the result. And while *Bagley* appears to give little weight to other factors—such as the degree of fault on the prosecutor's part and the specificity of the defense request—it is not entirely clear that these variables must be ignored. *United States v. Sepulveda,* 15 F.3d 1216, 1220 (1st Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 2714, 129 L.Ed.2d 840 (1994).

### 2. *Standard of Review*

■■■ The denial of a motion for new trial is reviewed only for manifest abuse of discretion. *See United States v. Wright,* 625 F.2d 1017, 1019 (1st Cir.1980). The instant motion for new trial triggers a two-tier inquiry. First, to the extent the "new" evidence pertains to the disposition of the pretrial motion to suppress financial records, wherein the *district court* was the trier of fact, Tibolt confronts the daunting task of demonstrating that the district court committed clear error in determining that the "new" evidence would not have altered its pretrial factual findings. *Zapata,* 18 F.3d at 975 (noting that factual findings and credibility determinations relating to suppression issues are normally for the trier of fact). Second, Tibolt must show that the "new" evidence would so undermine the government's case as to give rise to a "reasonable" probability of acquittal upon retrial. *Sepulveda,* 15 F.3d at 1220.[6]

### 3. *The Incident Cards*

■■■ We cannot say that the district court ruling constituted a manifest abuse of discretion. The district court found, *inter alia,* that the police incident reports would not suffice to undermine Officer Palazzola's credibility; hence, were not likely to result in an acquittal. *Tibolt,* 868 F.Supp. at 382. Nor are we persuaded that Palazzola perjured himself at the suppression hearing. Rather, he testified simply that he could not remember having been at the Dombrowski residence prior to July 27, 1992. In fact, the incident cards show that he was sent there on but *one* occasion—*three years* before the pretrial suppression hearing. Further, this incident card did not even compel the conclusion that Palazzola went to, or secured, the Dombrowski residence on *that prior occasion.* Thus, the district court was entitled to find that the incident cards did not undermine Palazzola's claimed lack of memory. *Cf. Natanel,* 938 F.2d at 313 (noting somewhat lesser burden on new-trial movant where evidence shows witness's prior testimony was "deliberately false"). Given their marginal direct probative value, we cannot say that the incident cards alone were sufficient to generate a "reasonable" probability that Tibolt would be acquitted upon retrial. *Cf. Sepulveda,* 15 F.3d at 1220 n. 5 (noting that newly discovered evidence pertaining exclusively to a government witness's credibility rarely warrants new trial).

### 4. *The Lemieux Affidavit*

■■■ The district court found the Lemieux affidavit similarly inconclusive. Although the affidavit might contribute to a plausible inference of police conspiracy, it certainly did not *compel* such a finding, especially since its temporal relevance is so unclear. For one thing, it is not unreasonable to think that Lemieux may have been imprecise in recollecting the *sequence* of the events which had occurred a year and a half earlier. That is to say, there is nothing in the affidavit to suggest but what Lemieux may have been remembering that Tibolt was arrested and that an informant's tip simply *corroborated* what the officers themselves accidentally discovered. Nor does the Lemieux affidavit, vague as it is, make it probable that an acquittal would result upon retrial.

■■■ In all events, we need not rest our decision solely on the "credibility" ground, since the district court found also—with respect to the information in the Lemieux affidavit—that Tibolt had not met the first two prongs of the *Ortiz* test. *See Natanel,* 938 F.2d at 313 (failure to establish *any* of the

---

6. We assume, without deciding, that the "new" evidence was within the government's control and potentially subject to disclosure. *But see infra* Section II.B.4 (noting that government did

disclose essential information, later reiterated in Lemieux affidavit, at pretrial suppression hearing).

four *Ortiz* factors defeats motion for new trial). The court further found that Tibolt had not shown that this "new" evidence was either unknown or unavailable at the time of the pretrial suppression hearing, nor that Tibolt had exercised due diligence to discover the evidence earlier. *See Tibolt*, 868 F.Supp. at 382 ("What is more, the government proffered at the suppression hearing the fact that Tibolt's home had been the subject of a local drug investigation before the search, and made available to Tibolt one of the officers involved in that investigation for questioning."). At the pretrial suppression hearing, moreover, the government disclosed to the defense that Officer Williams participated in a previous task force surveillance of the Tibolt residence, and that "at that time there were *some reports* of possible drug activities involving that house." (Emphasis added.) This disclosure certainly should have alerted Tibolt to the probability that an informant was involved. Yet Tibolt failed to pursue information relating to whether the warrantless search of July 27, 1992 was a mere "ruse" designed to fabricate a showing of probable cause. Since the finding that Tibolt failed to exercise due diligence was not clearly erroneous, *see Zapata*, 18 F.2d at 975, he may not rely on this evidence to mount a renewed attack on the warrantless search or the search warrant application.[7]

***The district court judgment is affirmed.***

---

**7.** As noted above, *see supra* p. 4, Tibolt not only challenges the pretrial determination that Palazzola's *warrantless search* was valid, but cites *Franks v. Delaware* as authority for a direct challenge to the subsequent *search warrant*, which was premised entirely on the fruits of the earlier warrantless search. A defendant is not entitled to a *Franks* evidentiary hearing, however, absent a "substantial preliminary showing (1) that a false statement [or material omission] in the affidavit [supporting the search warrant application] has been made knowingly and intentionally, and (2) that the false statement [or material omission] is necessary for a finding of probable cause." *United States v. Scalia*, 993 F.2d 984, 987 (1st Cir.1993) (*citing United States v. Rumney*, 867 F.2d 714, 720 (1st Cir.), *cert. denied*, 491 U.S. 908, 109 S.Ct. 3194, 105 L.Ed.2d 702 (1989)).

We discern no principled basis for treating the *Franks* claim differently than Tibolt's direct challenge to the warrantless search. To the extent the "new" evidence underlying the *Franks* hearing request was available prior to trial (i.e., the Lemieux affidavit) by the exercise of due diligence, Tibolt's post-trial *Franks* request based on that evidence is untimely. *See supra* Section II.B.4. The marginal probative value of the incident cards in undercutting Palazzola's pretrial testimony is insufficient, by itself, to support a "*substantial* preliminary showing" that the evidence, if disclosed, would have altered the decision that there was probable cause to issue a search warrant. *See supra* Section II.B.3; *see also, e.g., United States v. Hiveley*, 61 F.3d 1358, 1360 (8th Cir.1995) (noting that "the 'substantial showing' requirement needed to obtain a *Franks* hearing is not lightly met").