**UNITED STATES of America,**
**Plaintiff,**

v.

**Shawn MONTEGIO, Defendant.**

No. C.R. 03–005S.

United States District Court,
D. Rhode Island.

July 25, 2003.

Mary E. Rogers, Esq., Kenneth P. Madden, Esq., U.S. Attorney's Office, Providence, RI, for Plaintiff.

John J. Bevilacqua, Esq., Bevilacqua & Gosz, Peter P. D'Amico, Esq., D'Amico & Testa, Providence, RI, for Defendant.

### *MEMORANDUM AND DECISION*

SMITH, District Judge.

Before the Court for decision are the Defendant's Motion to Suppress Evidence Derived from Wiretap Warrants ("Wiretap Motion") and Motion to Suppress the Fruits of the Warrantless Entry, Arrest, Search and Seizure ("Warrantless Entry Motion") in the above case. Pursuant to

Rule 12(d) of the Federal Rules of Criminal Procedure the Court makes the following findings of fact and conclusions of law.

*Findings of Fact*

Beginning sometime in late 2002, members of the High Intensity Drug Trafficking Area Task Force (HIDTA), an inter-agency law enforcement task force designed to investigate drug trafficking, began an investigation of numerous individuals in the Central Falls, Rhode Island area. These individuals were allegedly involved in large scale drug trafficking operations. The group was led, allegedly, by the Defendant, Shawn Montegio.

In connection with this investigation, the Rhode Island State Police, with the assistance of the United States Attorney's Office, obtained two consecutive warrants for wiretaps on cellular phones owned by Shawn Montegio. The wiretap warrant applications were supported by affidavits from Assistant United States Attorney Kenneth Madden and Rhode Island State Police Detective Kevin O'Brien. The wiretap warrants were signed by Chief Judge Ernest Torres of this court on November 15, 2002 and January 10, 2003. Gov. Exs. 1 and 2.

As a result of the intercepts made pursuant to the wiretap warrants, HIDTA task force members learned of a possible drug transaction between Montegio and certain unidentified individuals in New York City. The agents learned through these intercepts that the anticipated transaction was going to take place on February 9, 2003.

Government Exhibit 15, which is the audio recording of wiretap intercept number 617, is a conversation which took place between the Defendant and unidentified individuals in which the parties agreed to the terms of the drug transaction. The parties agreed on the price, the quantity, and the quality of the cocaine which was being purchased by the Defendant from his supplier. In this conversation, it was agreed that the unidentified individuals from New York would arrive at around 5 p.m. on Sunday, February 9, and the speaker from New York indicated that the transaction would occur "there." This conversation (number 617) occurred at 12:25 p.m. on Saturday, February 8, 2003.

As a result of learning that a major drug transaction was likely to occur at approximately 5 p.m. at the Defendant's house [1] at 45 Claremont Street in Central Falls, HIDTA task force members convened at approximately 10 a.m. on Sunday, February 9, 2003 to plan for a surveillance operation at the Defendant's residence.

As part of the surveillance operation, an undercover surveillance van was utilized. Detectives Patrick Reilly and Stephen Branch were assigned to man the surveillance van.

At approximately 12:30 p.m. that day, the van was driven to its location at the Knights of Columbus Hall, about 50 feet or more from 45 Claremont Street. Gov. Ex. 6. The van was driven to this location by Detective O'Brien, who parked the van at the Knights of Columbus Hall and then left on foot. Reilly and Branch remained inside the back of the van where they were able to conduct surveillance for the remainder of the day.

Through the windows of the van, Reilly and Branch were able to observe the front of 45 Claremont Street. In addition, they had a camera mounted on the roof of the van which was not detectable by observers.

---

**1.** While the suspects did not mention the Defendant's "house" by name until February 9, 2003, law enforcement presumed logically that the use of the term "there" by the New York suspect indicated that the transaction would occur at Montegio's home.

Gov. Exs. 7, 9. This camera fed video to them inside the van.

Perhaps as many as fifteen other HIDTA law enforcement officers were also deployed as part of this surveillance operation. These officers were established in other locations in the surrounding area, but none were as close to 45 Claremont Street as were Reilly and Branch, and none could see 45 Claremont Street. All officers were in communication with each other by radio.

During the course of the afternoon daylight hours, Detectives Reilly and Branch observed the Defendant numerous times. The Defendant appeared at the windows of the residence intermittently, and on one occasion came to the front window of the residence and looked up and down the street. The Defendant left 45 Claremont Street at approximately 4 p.m. in a white Yukon sport utility vehicle. He was not followed by any law enforcement officers. Some time that afternoon, Reilly and Branch also observed an associate of the Defendant, one Velagas, who was believed by law enforcement to be a "holder" of most of the Defendant's drug product, drive by 45 Claremont Street and the surveillance location at least two times. Velagas then drove away.

At no time during the day did it appear to Reilly or Branch that the Defendant or his associates had detected the surveillance operation. This was significant because officers believed, based on sources and prior experience, that the Defendant was extremely conscious of law enforcement surveillance and was skilled at detecting such surveillance, as were his associates.

At approximately 5 p.m. on February 9, Reilly and Branch learned through a wire intercept that the subjects from New York, who were scheduled to deliver the cocaine at approximately 5 p.m., were going to be late. They were now going to arrive at approximately 7 p.m.

At approximately 6:45 p.m., the Defendant's common law wife, Maria Benavides, exited the 45 Claremont Street residence and left with one of their children in the white Yukon. She returned to the residence at around 7 p.m. Immediately following her return, Reilly and Branch observed a gray Hyundai with Virginia license plates pull up to the residence and park in front of it. Two men exited the vehicle. One wore a white shirt or jacket, and the other wore a black jacket.

The two individuals who arrived in the gray Hyundai walked into the residence on the left hand side of the structure. Minutes later they exited the house and began to pull the gray Hyundai into the driveway. The man in the white shirt or jacket backed the car into the driveway while the man in the black jacket guided him. The car disappeared from view as it backed into the driveway behind a white fence-like gate, which shielded the major portion of the driveway from the street.

Agents testified that the gray Hyundai and the two men in it were unknown to law enforcement agents at this point in the investigation.

Seconds after backing the car into the driveway, the two men emerged from the driveway. The man in the black jacket was carrying a duffel bag which appeared to be heavy. The two walked together to the entrance and entered the residence. This occurred at approximately 7:10 to 7:15 p.m.

At approximately 8 p.m., Detectives Reilly and Branch received information that another call had been intercepted from the Defendant to one of his close associates, Julio Jaiman. In this conversation between the Defendant and Jaiman, which was entered into evidence as Gov-

ernment Exhibit 14 (a transcript of which is Government Exhibit 14E), the Defendant told Jaiman that he would call him in about half an hour to come and see him and to see something. Jaiman's residence was also under surveillance by law enforcement, and Jaiman was not observed to leave his residence at any time during this period. Shortly thereafter, at 8:30, Branch and Reilly received an instruction from Sergeant Joseph DelPrete, the ranking officer in the task force and its leader, to leave the van in order to enter the house.

Sergeant DelPrete testified that he made the decision to order the entry of the house even though no search warrant had yet been obtained. He testified that he was concerned about the possibility that Jaiman would be arriving shortly. He expressed misgivings that there were already two unknown male subjects inside the 45 Claremont Street residence. Adding a third subject to this already tenuous mise-en-scène made DelPrete uncomfortable. Further, DelPrete testified that he was concerned that the surveillance would be detected by Jaiman. He noted that officers had observed a runner (Velagas) pass by the residence two times; this, he believed, indicated that the Defendant would move the drugs quickly from the residence to other locations. When this rapid transfer did not occur between 7:15 and 8:20, DelPrete testified that he thought the drugs might be discarded. He also expressed concern about the likelihood of firearms in the residence, recalling an earlier reference by the Defendant to the purchase of a silencer. Finally, he testified that the criminal history of the Defendant and the fact that he was known to be involved with drugs and violence worried him as well.

As a result, DelPrete told Detective O'Brien that he was disquieted and that he wanted O'Brien to call Assistant United States Attorney Mary Rogers to inform her that agents were going to enter the house.

At this point, approximately 8:30 p.m., Detectives Reilly and Branch, as well as numerous other members of the HIDTA task force, converged on the front entrance to 45 Claremont Street. Detective O'Brien knocked and announced that state police were at the door. Within several seconds, the door was breached using a ramming device. There was a second door into the residence which was also battered.[2]

The first person through the door was Detective O'Brien, followed by Detective Reilly. They entered the kitchen and immediately observed a large quantity of cocaine stacked on the kitchen counter areas and a carton in the kitchen sink. The Defendant and the two other subjects were immediately in front of them. All three subjects began running to the other side of the kitchen toward the bathroom area as Reilly shouted, "State Police!" Reilly ran to the left side of the kitchen island in the direction that the three subjects had gone. He saw that the Defendant had entered the bathroom area and that the man with a dark shirt was also attempting to enter the bathroom. The Defendant was shutting the bathroom door on this man. Reilly moved the man in the dark shirt aside and entered the bathroom, where he grabbed the Defendant on the right shoulder area and took him to the ground. The Defendant was at that moment throwing a semi-

**2.** At the point where the second door is located, two other doors are present. One door leads to upstairs apartments in the house and the other to the basement. The door into the first floor apartment, which was the Defendant's residence, was directly in front of the outer door.

automatic pistol into the toilet. Gov. Ex. 10. Reilly handcuffed the Defendant and retrieved the handgun from the toilet. The handgun was fully loaded with a round in the chamber, meaning that it did not need to be cocked before it could be fired.

Resting on the kitchen counters in neat stacks was over $100,000 in cash. Kilogram wrappers for the cocaine were in the sink, in the process of being rinsed. Also in plain view in the kitchen were an electronic scale, a sealer, and nine stacked kilograms of cocaine. Gov. Exs. 11, 12 and 13.

The Defendant was advised of his *Miranda* rights at the time that Detective Reilly handcuffed him in the bathroom. When asked whether he understood those rights, Montegio nodded in the affirmative. Approximately fifteen to twenty minutes later, while he was still in the bathroom, the Defendant made statements to the effect that "in another hour you guys would not have even gotten me," and that "this is nothing, what you're seeing here. It might be big for around here in Rhode Island, but this is nothing compared to what I can do."

At this point, the house was secured; no additional search was conducted. All three men, the Defendant and the two subjects who arrived in the Hyundai, were arrested and held. Montegio's wife, Maria Benavides, was also in the residence with their four children. Benavides and the children were secured by Sergeant Del-Prete.

At approximately 10 p.m., officers at 45 Claremont Street received notification that a search warrant had in fact been issued. They then conducted a search of the residence. Incident to this search, officers seized the nine kilograms of cocaine, the over $100,000 in cash, some paperwork, a heat sealing device, wrappings in which the cocaine was packaged, kilogram wrap-

pings, and paperwork showing that the residence was in the custody of Shawn Montegio and Maria Benavides.

Prior to February 9, the Government had prepared an application for a search warrant including affidavits supporting the application. The information contained in the affidavits, most of which was available to the Government on February 8, 2003, pertained to the on-going investigation of the Defendant and various facts gleaned from intercepted telephone conversations and confidential sources. On February 9, but before the events leading to the surveillance and arrest of the Defendant, Special Agent Michael Kohn of the FBI called Assistant United States Attorney Mary Rogers and advised AUSA Rogers about the telephone intercepts on the 8th and 9th. Special Agent Kohn further advised AUSA Rogers of the fact that the subjects from New York would be arriving at approximately 7:30 p.m. instead of 5 p.m. shortly after receiving that information through the intercepted conversation. At about 5 p.m. on February 9, Special Agent Kohn met with Detective O'Brien and went to the office of the United States Attorney to meet with AUSA Rogers. They arrived at the U.S. Attorney's office at approximately 6 p.m. They began the process of completing the information in the search warrant application that had already been started. O'Brien and Kohn left the U.S. Attorney's office at about 7 p.m. and returned to the Central Falls area. As indicated above, a call was made to AUSA Rogers informing her of law enforcement's decision to enter the residence. At this point in time, officers had not yet made contact with Magistrate Judge Martin to present the search warrant application.

After the residence was entered, either Kohn or O'Brien once again called AUSA Rogers to inform her that the residence had been breached and secured and to tell

her that Kohn and O'Brien were on their way back to the U.S. Attorney's office to complete the search warrant application. The two arrived at the U.S. Attorney's office at approximately 8:45 p.m. After completing the application, which O'Brien signed, all three proceeded together to the home of Magistrate Judge Martin. They arrived there at approximately 9:00 p.m. Magistrate Judge Martin then reviewed the information presented in the application for between 45 minutes and an hour. He signed the search warrant at 10 p.m. Gov. Ex. 3.[3] At this point Detective O'Brien and Agent Kohn made telephone calls to Sergeant DelPrete and others on the task force team. After returning to the U.S. Attorney's office to drop off AUSA Rogers and make copies of the warrant, they returned to 45 Claremont Street, conducted a search and seized the items listed above which had been previously secured.

*Analysis*

Defendant challenges both the sufficiency of the evidence supporting the issuance of the wiretap warrants, and the admissibility of the evidence garnered by dint of the warrantless entry into 45 Claremont Street. The Court addresses the merits of these challenges in turn.

1. *The Wiretap Motion*

The law is settled that "Congress has placed statutory requirements on warrants authorizing wiretaps, extending beyond the constitutional minimum mandated for other search warrants." *United States v. Nelson–Rodriguez*, 319 F.3d 12, 32 (1st Cir.2003). Thus, the Court looks to Chapter 119 of Title III of the Omnibus Crime Control Act for the statutorily mandated procedure for obtaining a warrant for interception of a wire. 18 U.S.C. § 2518 sets forth the following pertinent requirements for the application for a wiretap warrant:

(1) Each application for an order authorizing or approving the interception of a wire ... communication under this chapter shall be made in writing upon oath or affirmation to a judge of competent jurisdiction and ... shall include the following information:

. . .

(b) a full and complete statement of the facts and circumstances relied upon by the applicant, to justify his belief that an order should be issued, including (i) details as to the particular offense that has been, is being, or is about to be committed, (ii) ... a particular description of the nature and location of the facilities from which or the place where the communication is to be intercepted, (iii) a particular description of the type of communications sought to be intercepted, (iv) the identity of the person, if known, committing the offense and whose communications are to be intercepted;

(c) a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous.

18 U.S.C. § 2518(1)(b), (c).

█ A court reviewing the viability of a decision to authorize a wiretap warrant is required "to examine the face of the affidavit and 'decide if the facts set forth in the

---

**3.** The evidence indicates that some of the facts set forth in the 45 Claremont Street search warrant were also present in a search warrant for 452 Weeden Street, Pawtucket, Rhode Island, which was sworn by Detective O'Brien and signed by Magistrate Judge Lovegreen on January 29, 2003, but never executed. Def. Ex. I.

application were minimally adequate to support the determination that was made.'" *Nelson–Rodriguez*, 319 F.3d at 32 (citing *United States v. Ashley*, 876 F.2d 1069, 1074 (1st Cir.1989)). The Court therefore adopts as factually accurate, for purposes of this Motion, the information contained in Detective O'Brien's two affidavits for wiretap warrants, dated November 15, 2002, and January 10, 2003.

Defendant assays four challenges to the adequacy of the November 15, 2002 wiretap affidavit[4] in meeting the statutory requirements: (a) that the affidavit to the court failed to establish probable cause to believe that Montegio had committed the offenses alleged because it was based primarily on the statements of confidential informants who are unreliable, untrustworthy, or lack an adequate basis of knowledge; (b) that the affidavit to the court failed to establish that the target telephone was being used as a tool in the commission of the offenses; (c) that the affidavit to the court was not "full and complete" as to the necessity of a wiretap warrant; and (d) that the affidavit to the court failed to establish necessity, that is, that it did not adequately support the conclusion that reasonable investigative techniques, short of wire-tapping, were not reasonably likely to prove successful in investigating Montegio.

#### a. *The Confidential Informants*

■■■ The Supreme Court's test for probable cause with respect to the information provided by confidential informants contemplates the totality of the circumstances. *Illinois v. Gates*, 462 U.S. 213, 233, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). Drawing on *Gates*, the First Circuit has set forth a "non-exhaustive" list to gauge the strength of a confidential informant's proffer in establishing probable cause, emphasizing that "[n]one of these factors is indispensable; thus, stronger evidence on one or more factors may compensate for a weaker or deficient showing on another":

> [W]hether an affidavit supports the probable " 'veracity' or 'basis of knowledge' of persons supplying hearsay information"; whether informant statements are self-authenticating; whether some or all of the informant's factual statements were corroborated wherever reasonable and practicable (e.g. through police surveillance); and whether a law-enforcement affiant included a professional assessment of the probable significance of the facts related by the informant, based on experience or expertise.

*United States v. Khounsavanh*, 113 F.3d 279, 284 (1st Cir.1997) (citing *United States v. Zayas–Diaz*, 95 F.3d 105, 111 (1st Cir.1996)); *cf. United States v. Chapdelaine*, 616 F.Supp. 522, 526 (D.R.I.1985) ("A tipster need not deliver an ironclad case to the authorities on the proverbial silver platter. It suffices if ... a prudent law enforcement officer would reasonably conclude that the likelihood existed that criminal activities were afoot, and that a particular suspect was probably engaged in them.").

■■■ The *Khounsavanh* court explained that "[t]he risk that the informant is lying or in error need not be wholly eliminated. Rather, what is needed is that 'the probability of a lying or inaccurate informer has been sufficiently reduced by corroborative facts and observations.'" 113 F.3d at 284 (citation omitted). "No one factor possesses talismanic powers." *Id.* at 285. Even double-hearsay state-

---

**4.** While the Wiretap Motion is framed as a challenge to both wiretap warrants, the vast majority of the arguments advanced by the Defendant relate solely to the November 15, 2002 wiretap warrant.

ments need not be discarded if they are corroborated through other sources of information. *See Gates,* 462 U.S. at 244–45, 103 S.Ct. 2317 ("It is enough, for purposes of assessing probable cause, that 'corroboration through other sources of information reduced the chances of a reckless or prevaricating tale,' thus providing 'a substantial basis for crediting the hearsay.' ") (citations omitted).

▓▓▓ Finally, "the government is not required to show that other methods have been wholly unsuccessful. Nor is the government forced to run outlandish risks or to exhaust every conceivable alternative before requesting authorization for electronic surveillance." *United States v. Ashley,* 876 F.2d 1069, 1072 (1st Cir.1989). While "bare conclusory statements that normal techniques would be unproductive, based solely on an affiant's prior experience" may be insufficient, "[n]evertheless, the issuing court may properly take into account affirmations which are founded in part upon the experience of specially trained agents." *Id.* Only "minimal adequacy" with respect to necessity is ultimately required. *Nelson–Rodriguez,* 319 F.3d at 33.

Applying the *Khounsavanh* factors here, the Court observes that the single most powerful fact in the Government's favor is that five of the six confidential informants who provided the essential basis to support probable cause in the first affidavit represented that they had *personal knowledge* that the Defendant was a high-volume drug dealer, in that they had been in his presence when the Defendant was engaged in drug transactions. Moreover, some of these Sources provided information respecting the Defendant's use of the subject cellular telephone numbers for drug distribution-related purposes:

- Source 2 represented that he had been in the presence of Montegio "when he has observed Shawn Montegio discussing narcotic transactions over his cellular phone. Source 2 said that during June 2001, Source 2 was with Shawn Montegio in Pawtucket, Rhode Island and observed Shawn Montegio meet with an unidentified subject and deliver two kilograms of cocaine to the unidentified subject." November 15, 2002 Affidavit ("Affidavit"), ¶ 20. Furthermore, Source 2's veracity is enhanced because he has previously provided information that has led to the arrests of individuals for drug-related offenses. *Id.*

- Source 3 represented that he had been in Montegio's presence several times and observed him to be in possession of large amounts of cocaine. Affidavit, ¶ 21. Furthermore, Source 3 advised that he had witnessed Montegio use his cellular telephone number, (401) 258–6255 (which Verizon Wireless records indicate was a number registered to Shawn Montegio with an address at 45 Claremont Street in Central Falls, RI, Affidavit, ¶ 23), to make and receive calls to and from individuals requesting to purchase cocaine. These calls, Source 3 reported, were brief and encrypted in nature when Montegio arranged meetings with customers for the sale of cocaine. Affidavit, ¶ 22. Source 3 also stated that he had personally contacted Montegio several times by calling the cellular number, during which conversations they had discussed the purchase of cocaine. One of these conversations was monitored by Detective Reilly. In mid-October 2002, Source 3, under the supervision of law enforcement, telephoned (401) 864–8541 and agreed to meet with Montegio in Pawtucket. During that call, Source 3 spoke in code to Montegio. At the meeting be-

tween Source 3 and Montegio, Montegio was observed to hand over an object to Source 3, which was a quantity of cocaine. Source 3 has provided reliable information in the past that has led to the arrest of individuals for violations of the Uniform Controlled Substances Act.

- Source 4, who is in prison for distributing cocaine, represented again that he had been in Montegio's presence during the past year and observed Montegio in possession of several kilograms of cocaine and large amounts of currency. Source 4 also stated that he has known Montegio for many years and knows him to be a high-level drug dealer. Although Source 4 has never provided information to law enforcement before, the affiant stated that he believed the information provided by Source 4 because it had been corroborated by the other Sources. Affidavit, ¶ 24.

- Source 5 advised that he has been in Montegio's presence and has observed him to be in possession of several kilograms of cocaine. Source 5 also identified the (401) 258–6255 cellular number, but further stated that Montegio switched his cellular number to (401) 864–8541 as a result of having been detained by the police in August 2002, and in order to avoid detection by the police. While Source 5 had never provided information before, the affiant attested that Source 5's information had been corroborated by the other Sources and information available to law enforcement. Affidavit, ¶ 26.

- Source 6, who like Source 4 is now in prison for distributing a controlled substance and had never before provided information to law enforcement, stated that he has been in Montegio's presence several times when large amounts of cocaine were distributed by Montegio. Source 6 also represented that he has contacted Montegio numerous times on the (401) 864–8541 cellular number and has discussed cocaine transactions with Montegio on that phone. Source 6 also identified Julio Jaiman as someone to whom Montegio arranged to distribute cocaine via the cellular phone. Affidavit, ¶ 27.

The Defendant contends, without offering any supporting authority, that the information provided by Sources 2, 4 and 5 is insufficient to demonstrate that any of them had first-hand knowledge that Montegio was a drug dealer, because the Sources do not provide sufficient detail to satisfy the Defendant: *e.g.*, descriptions of the locations of their observations of Montegio's drug dealing, or the other people present at the time of their observations. But the Court fails to understand how these asserted lacunas make the information that was provided "grossly lacking in detail."

Furthermore, the Defendant attacks the credibility of some of these Sources because Sources 4 and 6 were in prison at the time that they provided their information, and because none of the Sources admitted his or her own criminal culpability. While these are all factors to be considered, they are not per se requirements. More importantly, Defendant's contentions do not provide a remotely sufficient counterweight to tip the scale against the veritable anvil of probable cause evidence, much of it corroborated, provided by these Sources.

Likewise, the complaints concerning the asserted lack of detail provided by Sources 3 and 6 (both of whom Defendant concedes had a basis of knowledge for the information that they provided) are *de minimis* when compared with the hefty quantum of

inculpating evidence provided by these Sources.

b. *The Target Telephone Number*

■ The Defendant next contends that a careless typographical error in the affidavit divests it of probable cause. Notwithstanding the fact that several of the confidential Sources stated that the Defendant used his cellular telephone to conduct drug deals, their identification of the target telephone numbers, and the telephone call (by Source 3) to one of those numbers which led to a verifiable drug deal, Defendant argues that the affiant's absent-minded misspelling of Defendant's first name as "Shaw" rather than "Shawn" tips the totality of the circumstances balance in his favor. He is mistaken. While courts naturally prefer error-free submissions, the inclusion of such errors in these circumstances is, again, of minuscule import when compared with the wealth of evidence supporting the issuance of a wiretap warrant for the target telephone number.[5]

c. *Necessity*

■ The Defendant's last two challenges relate to the requirement that the affiant set forth sufficient facts to establish the "necessity" of surveilling Montegio by wiretap. The November 15, 2002 application contains no less than eleven full pages of detailed and exhaustive discussion concerning the difficulties and limitations of physical and undercover surveillance, use of grand jury subpoenas, confidential sources, interviews of subjects or associates, search warrants, pen registers and telephone toll records, trash searches, mobile tracking devices, and pole cameras. This comprehensive analysis far exceeds

the First Circuit's standard of "minimal adequacy" in the context of a showing of necessity. *Nelson–Rodriguez*, 319 F.3d at 33.

2. *The Warrantless Entry Motion*

When stripped of its superfluities, Defendant's Warrantless Entry Motion is, first, an attack on the existence of exigent circumstances to enter the Defendant's home without a search warrant; and second, a challenge to the application of the inevitable discovery doctrine.

a. *Exigent Circumstances*

■ Law enforcement entered 45 Claremont Street on February 9, 2003 without a warrant. The warrantless entry into a person's home is presumed to be unconstitutional unless it is justified by exigent circumstances. *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). The First Circuit has instructed that "[e]xigent circumstances exist where law enforcement officers confront a 'compelling necessity for immediate action that [would] not brook the delay of obtaining a warrant.'" *United States v. Tibolt*, 72 F.3d 965, 969 (1st Cir.1995) (citing cases). Exigent circumstances that justify the warrantless search of a residence include

> (1) 'hot pursuit' of a fleeing felon; (2) threatened destruction of evidence inside a residence before a warrant can be obtained; (3) a risk that the suspect may escape from the residence undetected; or (4) a threat, posed by a suspect, to the lives or safety of the public, the police officers, or to [an occupant].

---

5. Defendant likewise argues that the frequency with which "Shaw" has been substituted for "Shawn" indicates that the affiant simply "cut-and-pasted" the same erroneous information at various points in the affidavit.

Even if true, this only evidences a certain sloppiness on the affiant's part. It does not affect the veracity of the representations of personal knowledge made by the confidential informants.

*Hegarty v. Somerset Cty.*, 53 F.3d 1367, 1374 (1st Cir.1995), *cert. denied*, 516 U.S. 1029, 116 S.Ct. 675, 133 L.Ed.2d 524 (1995). The determination of whether sufficient exigency exists to justify the warrantless entry into a home is a fact intensive one, and the determination is "limited to the objective facts reasonably known to, or discoverable by, the officers at the time of the search." *Tibolt*, 72 F.3d at 969, (citing *Illinois v. Rodriguez*, 497 U.S. 177, 186, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990)).

The Government purports to rely on the second and third listed exigencies. It contends that (1) intercepted wire communications demonstrated that Montegio was very surveillance conscious; (2) the wire intercept at approximately 8:05 p.m. on February 9 revealed that Montegio had called Jaiman and wanted Jaiman to come to 45 Claremont Street to show him something; and (3) law enforcement was concerned that Jaiman, when he arrived, would espy the surveillance and alert Montegio, which would in turn permit Montegio to destroy evidence and/or escape.

But these circumstances fall far short of constituting an exigency sufficient to sanction the warrantless entry into a home. In the first place, the transcript of the conversation between Montegio and Jaiman does not indicate that Jaiman was on his way to 45 Claremont Street; rather, Montegio stated that *he would call* Jaiman in about half an hour in order to arrange a time for them to meet. Furthermore, the task force had Jaiman's apartment under surveillance, and there had been no reports of his leaving his apartment. Thus, while a situation might have eventually arisen in which Jaiman could have detected the police presence near 45 Claremont Street, there was no reasonable basis to assume that this eventuality was imminent or even probable at the time the decision was made to enter the house. *See United States v. Cresta*, 825 F.2d 538, 553 (1st Cir.1987) (the test for the existence of exigent circumstances is one of reasonable belief). Moreover, there was simply no reasonable basis for the belief that the Defendant, despite his history of surveillance awareness, had any inkling that he was being surveilled on February 9. *See United States v. Curzi*, 867 F.2d 36, 43 n. 7 (1st Cir.1989) (citing *United States v. Munoz–Guerra*, 788 F.2d 295, 299 (5th Cir. 1986) ("We concur with the Fifth Circuit that, without more, 'in the ordinary case the risk that a criminal suspect will become aware of covert surveillance is ... insignificant in contrast to the more substantial benefits we all derive from the procedural safeguards of judicial process.' ")).

Likewise, exigent circumstances exist only if there is a *"great* likelihood" that evidence will be destroyed. *United States v. Veillette*, 778 F.2d 899, 902 (1st Cir.1985) (emphasis in original). Here, Detective Reilly testified in the clearest terms that neither the Defendant nor anyone else had detected the presence of law enforcement prior to the entry of 45 Claremont Street. The possibility of spoliation is premised solely on Jaiman's eventual arrival at an indeterminate time, the presumption of Jaiman's detection of surveillance, and the supposition that Jaiman would advise Montegio. This level of attenuation and surmise fails to meet the rigorous standards of exigency required in this circuit. *See United States v. Adams*, 621 F.2d 41, 44 (1st Cir.1980) (defining exigency as "a compelling necessity for immediate action").[6] Thus, there are no exigent cir-

---

6. The Government also contends that because the underlying offense relates to drug trafficking, and because firearms are "tools of the drug trade," the warrantless search was per-

cumstances that justify the warrantless search of 45 Claremont Street.

 The absence of exigent circumstances negatively impacts the admissibility of the Defendant's statements on February 9, 2003 in the bathroom of his home. "[V]erbal evidence which derives so immediately from an unlawful entry and an unauthorized arrest ... is no less the 'fruit' of official illegality then the more common tangible fruits of the unwarranted intrusion." *Wong Sun v. United States,* 371 U.S. 471, 485, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963) (citing *Nueslein v. District of Columbia,* 115 F.2d 690 (D.C.Cir.1940)). The Government concedes that it has not established sufficient attenuation of the Defendant's statements from the warrantless entry to dissipate the poisonous taint of the Fourth Amendment violation, and this Court agrees. Consequently, the Defendant's statements in the bathroom of his home immediately following the warrantless search shall be suppressed.

b. *Inevitable Discovery*

 The inevitable discovery doctrine first enunciated by the Supreme Court in *Nix v. Williams* permits the admission of evidence obtained by unlawful means "[i]f the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means." 467 U.S. 431, 444, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984).

The First Circuit has drawn an important distinction between cases in which a warrantless entry into a home is followed by the procurement of a warrant, and those in which a warrantless search is never followed by a warrant. *United States v. Silvestri,* 787 F.2d 736, 744–45 (1st Cir.1986). In cases where a warrant is eventually obtained, the *Silvestri* court rejected the so-called "active pursuit" requirement.[7] *Id.* at 746. Instead, in such cases, the court established the following test to determine whether the inevitable discovery doctrine can salvage evidence obtained without adherence to Constitutional procedures: (1) whether the legal means are truly independent; (2) whether the use of the legal means and the discovery by that means are truly inevitable; and (3) whether the application of the inevitable discovery exception provides either an incentive for police misconduct or significantly weakens Fourth Amendment protection. *Id.* at 744.

Here, there is no dispute that, for several days and perhaps weeks prior to February 9, 2003, law enforcement had been in the process of marshaling evidence that would eventually form the major part of the search warrant application presented to Magistrate Judge Martin. There is also no dispute that Magistrate Judge Martin did sign the search warrant for 45 Claremont Street at approximately 10:00 p.m. on February 9. The application for that search warrant was replete with probable cause to believe that evidence of drug traf-

---

missible in order to ensure police and public safety. Gov. Mem. at 8–9. The Court can find no case in this circuit, however, that condones the warrantless entry into a home simply because there is a commonsensical connection between guns and drugs. Exigent circumstances depend on the existence of "specific evidence" known to the police in the particular case, not unsubstantiated generalities. *See United States v. Hidalgo,* 747 F.Supp. 818, 826 (D.Mass.1990).

7. This writer, in another opinion issued just this week, has had occasion to discuss the teachings of *Silvestri* in some detail. *See United States v. Torres,* C.R. No. 03–038S, at 30–34, 2003 WL 21801548 (D.R.I. Jul. 23, 2003). The reader is referred to that opinion for a more thorough analysis of the First Circuit's approach to the inevitable discovery doctrine.

ficking-related crimes would be discovered at 45 Claremont Street, including the details of the meeting between the Defendant and the New York subjects which had been intercepted by wiretap. The application did not contain any identification or description of the evidence that law enforcement had discovered as a result of their warrantless search; it only informed the Magistrate Judge that the New York subjects had indeed arrived as anticipated, and that the premises had been secured by law enforcement officers.

Defendant's primary challenge relates to the independence prong of the *Silvestri* test. Defendant contends that the search warrant was not "truly independent" because Detective O'Brien and Special Agent Kohn were involved both in the illegal activity and in procuring the search warrant. Def. Mem. at 14–15.

The First Circuit has had occasion to address this argument in *United States v. Ford*, 22 F.3d 374, 380 n. 5 (1st Cir.1994):

> Dr. Ford also argues that the warrant should not be considered independent because the agents who were involved in the warrantless search were also the agents who prepared the search warrant. Many courts have considered the level of participation by agents not involved in the original search. These cases demonstrate that the level of participation is *one* of the many factors to be considered when determining the independence of the warrant. As we have previously stated, the independence of the warrant in the present case is firmly established. The overlap between the agents searching the premises prior to

the warrant and the agents preparing the warrant does not alter our holding.

*Id.* (internal citations omitted) (emphasis in original).[8] So, too, here, where the independence of the warrant was clearly established prior to the illegal police conduct; even setting aside the tainted information garnered after the home entry (and which was not included in the search warrant application), the information in the warrant application was more than sufficient to support the issuance of the warrant to search Montegio's home. "It requires no speculation to determine that the excised affidavit supports a finding of probable cause." *Ford*, 22 F.3d at 379. While it may have been more prudent for the Government to have sought the search warrant through agents who had not participated in the illegal entry, this writer does not find the Government's decision to the contrary, without more, to impugn the warrant's independence.

■■■ The Defendant attempts one last, ultimately feckless attack on the application of the inevitable discovery doctrine: he invokes the last prong of *Silvestri*, claiming that the doctrine's use here to rescue the otherwise tainted evidence would encourage police misconduct and offend the Fourth Amendment. The Court disagrees. The *Ford* court cautioned that only one district court in this circuit has ever refused to apply the inevitable discovery doctrine due to the incentive for police misconduct. *Ford*, 22 F.3d at 380 (citing *Rullo*, 748 F.Supp. 36) (noting the exceptionally egregious circumstances of *Rullo* and holding that "[t]he present case obvi-

---

8. Defendant points to certain language in *United States v. Rullo*, 748 F.Supp. 36, 44 (D.Mass.1990) in support of his argument. Although it is true that the *Rullo* court emphasizes that a search warrant should be sought by "officers who were unaware and uninformed of the [illegal conduct]," that case

is distinguishable in the severity and pervasiveness of the police misconduct therein at issue. *See id.* (agents who would have participated in the purportedly inevitable discovery of evidence also participated in beating the defendant in order to elicit information that would facilitate that search).

ously does not involve such blatant police misconduct"); *see also United States v. Scott,* 270 F.3d 30, 45 n. 9 (1st Cir.2001) (same). The circumstances of this case, like those of *Ford,* do not justify a refusal to apply the inevitable discovery doctrine: no abusive police misconduct permeates this case, and the warrant application contained ample untainted probable cause evidence to support a search of 45 Claremont Street. Therefore, the evidence illegally obtained at 45 Claremont by the warrantless search is salvaged by operation of the inevitable discovery doctrine.

*Conclusion*

For the foregoing reasons, the Court enters the following ORDERS:

1. Defendant's Motion to Suppress Evidence Derived from Wiretap Warrants is DENIED;

2. Defendant's Motion to Suppress the Fruits of the Warrantless Entry, Arrest, Search and Seizure, to the extent that it relates to the Defendant's oral statements at 45 Claremont Street on February 9, 2003, is GRANTED; and

3. Defendant's Motion to Suppress the Fruits of the Warrantless Entry, Arrest, Search and Seizure, to the extent that it relates to any and all physical evidence seized from 45 Claremont Street is DENIED.

IT IS SO ORDERED.