**United States Court of Appeals**

**FOR THE EIGHTH CIRCUIT**

_____

No. 96-3831

_____

United States of America,   *
                                 *

        Appellee,         *

                                 * Appeal from the United
States
    v.                    * District Court for the
                                 * District of South Dakota.

Donald Twiss,            *

                                 *

        Appellant.       *

_____

Submitted: March 11, 1997

Filed: October 20, 1997

_____

Before MAGILL,[1] JOHN R. GIBSON, and MURPHY, Circuit
    Judges.

_____

MAGILL, Circuit Judge.

Donald Twiss pled guilty to the charge of unlawful possession of marijuana, in violation of 21 U.S.C. § 844 (1994). Twiss's plea of guilty was conditioned on obtaining appellate review of two issues: (1) whether the district court[2] erred by not

_____

[1]The Honorable Frank J. Magill was an active judge at the time this case was submitted and assumed senior status on April 1, 1997, before the opinion was filed.

[2]The Honorable Richard H. Battey, Chief Judge, United States District Court for the District of South Dakota.

suppressing the evidence obtained from a warrantless urinalysis, and (2) whether the district court erred by not suppressing inculpatory statements that Twiss made when he was confronted with the results of the urinalysis. We affirm.

## I.

During the early evening of Tuesday, October 17, 1995, a jeep traveling near Oglala, South Dakota, rolled over while going down a steep incline. Three occupants of the jeep, Donald Twiss, Twiss's wife, and Duane Ross, were able to walk away from the accident. The fourth occupant, Ron Red Star, was pinned under the jeep's roll bar and died in the accident.

The three survivors walked to the nearby residence of Vivian Reed where the Twisses had left their car earlier. The three survivors did not speak with anyone in the Reed residence, nor did they call the police to report the accident. Instead, the three survivors drove the Twisses' car to Pine Ridge, South Dakota, to seek medical attention.

Prior to reaching the hospital, however, the three survivors stopped at a pay phone near a service station in Pine Ridge shortly before 8:00 p.m. Twiss notified the police department of the roll-over accident.

Oglala Sioux Tribe Criminal Investigator Stanley Star Comes Out and several other police officers arrived at the scene of the accident at about 8:30 p.m. that evening. Star Comes Out found Red Star's body pinned

beneath the overturned jeep and found a beer clutched in Red Star's hand. The police officers discovered marijuana both in Red Star's pocket and in a nylon sports bag in the front area of the jeep. The sports bag also contained mail that belonged to the owner of the jeep, Robert Martin. Lastly, the police officers found the remains of some smoked marijuana cigarettes in the jeep.

At about 9:00 p.m., Star Comes Out called Special Agent Douglas Grell of the Federal Bureau of Investigation (FBI). Star Comes Out briefed agent Grell about the investigation of the accident and informed Grell of the marijuana found at the scene of the accident in Red Star's pocket and in the nylon sports bag.

Star Comes Out then went to the hospital to interview the accident survivors. Twiss and Ross told Star Comes Out that Red Star, the deceased occupant of the jeep, had been driving the jeep when it rolled over. When asked why they had not called the police from Vivian Reed's residence, Twiss and Ross gave different answers. Ross said that he did not call the police from Vivian Reed's residence because no one was home. Twiss explained that he did not want to use Reed's phone because the mother of Red Star lived at the Reed residence and Twiss did not want to tell her about her son's death. Twiss also stated that he did not use the telephone at the Reed residence because he wanted to take his wife to Pine Ridge for medical attention immediately. Star Comes Out observed that both Twiss and Ross appeared to be intoxicated during the interview.

Before Star Comes Out left the hospital, Captain Lionel Iron Moccasin of the Oglala Sioux Tribe Public Safety Commission asked Star Comes Out which of the survivors was going to be given a substance test. Star Comes Out replied that he would ask agent Grell. Star Comes Out then returned to the police station.

At the police station, Star Comes Out contacted agent Grell for the second time. There is contradictory

-4-

testimony about whether Star Comes Out relayed to agent Grell the information that Star Comes Out obtained when he interviewed Twiss and Ross. Twiss contends that, at the time of the second phone call to agent Grell, Star Comes Out had not yet interviewed either Twiss or Ross. At the suppression hearing, Star Comes Out was confused as to whether he conducted his interview of Twiss before or after the second phone call to agent Grell. See Trial Tr. 91:24-25 to 92:1; 94:21-24 (testimony of Star Comes Out). However, Star Comes Out testified that, prior to his

second conversation with agent Grell, Star Comes Out had observed Twiss's demeanor and that Twiss smelled of alcohol. Trial Tr. 93:2-24. Star Comes Out also testified that, before Star Comes Out spoke with agent Grell for the second time, another law enforcement official in the emergency room, Harold Brewer, may have told Star Comes Out that Twiss appeared to be intoxicated. Trial Tr. 102:13-23. Moreover, agent Grell testified that, prior to agent Grell's ordering of the urine test, Star Comes Out had told him that Twiss and Ross appeared to be intoxicated. Trial Tr. 10:11-12.

During Star Comes Out's second conversation with agent Grell, agent Grell ordered that urine samples be taken from Twiss, Twiss's wife, and Ross. At the time agent Grell ordered the urine tests, no warrant had been issued, none of the survivors were under arrest on either federal or tribal charges, and none had been Mirandized. Agent Grell has testified, however, that at the time he gave the order, he suspected that someone besides Red Star was driving the jeep because Red Star died with a beer in his hand.

Captain Iron Moccasin took the urine samples without advising the survivors that they could refuse to give the urine samples or that they were free to leave. The sample from Twiss's wife was taken at 9:50 p.m., the sample from Twiss was taken at 10:00 p.m., and the sample from Ross was taken at 10:30 p.m. Twiss's test showed that he had consumed marijuana.

After agent Grell received the urinalysis reports, he interviewed Twiss. Agent Grell confronted Twiss with the

urinalysis results, implying that the results were incriminating.  Agent Grell also advised Twiss that Twiss was not under arrest, that Twiss would not be arrested at the conclusion of the interview, and that Twiss did not have to answer any questions or provide any information if he did not want to do so voluntarily.

Twiss confessed to having used marijuana at his home in Porcupine, South Dakota, on the Saturday night before the accident. Twiss was subsequently charged with having possessed marijuana on or about October 14, 1995, the Saturday before the October 17 accident.

Following a hearing, a United States magistrate judge issued an order on May 3, 1996, suppressing the evidence derived from the urine sample taken from Twiss, including the admissions Twiss made when he was confronted with the results of the urinanalysis. The government appealed this order, and the district court reversed the order.

Before the district court, Twiss entered a conditional guilty plea to the charge of unlawful possession of marijuana, in violation of 21 U.S.C. § 844. Twiss now appeals.

**II.**

Twiss argues that the district court erred by not suppressing the results of the warrantless urinalysis. Specifically, Twiss asserts that there was no probable cause to justify this warrantless search. We disagree.

A compelled urinalysis is a search under the Fourth Amendment, see Skinner v. Railway Labor Executives' Ass'n, 489 U.S. 602, 617 (1989). We review de novo the district court's determination of the existence of probable cause sufficient to justify a warrantless search. See Ornelas v. United States, 116 S. Ct. 1657, 1659 (1996). Probable cause sufficient for a warrantless search exists "where the known facts and circumstances are sufficient to warrant a man of reasonable prudence in

-8-

the belief that contraband or evidence of a crime will be found." Id. at 1661.

In this case, we have no doubt that a person of reasonable prudence would believe that evidence of a crime would be discovered through a urinalysis of Twiss.

Twiss was one of three survivors involved in a single-vehicle accident that caused the death of Red Star. Despite the serious and tragic nature of the accident, and the fact that the body of Twiss's friend lay pinned beneath the roll bar of the jeep, Twiss left the accident scene and failed to contact the police at his first opportunity. The police found evidence of both alcohol and marijuana at the accident scene, raising the inference that intoxication had played a role in Red Star's death. The police further suspected that Red Star had not been driving,[3] which suggested that Twiss could have been the driver whose actions resulted in Red Star's death. At the hospital, Star Comes Out observed Twiss's demeanor, smelled alcohol on Twiss, and concluded that Twiss was likely intoxicated, which was consistent with the drug and alcohol use indicated by the evidence found at the accident scene. In all the circumstances of this case, the police could have reasonably believed that Twiss had been using marijuana while he was a passenger in the jeep, or the police could have reasonably believed that Twiss was driving the jeep while intoxicated, either

---

[3]Contrary to the dissent's assertion that it was "unlikely that anyone other than Red Star was driving," slip op. at 9, both agent Grell and Star Comes Out testified at length to the reasons why they suspected that Red Star was likely not driving the jeep at the time of the accident. See Trial Tr. 9:1-5 ("[The other officers and Star Comes Out] found Mr. Red Star clutching a bottle of beer. I suppose it's possible that he could have cranked it [the steering wheel during the roll over] hard to the left with one hand, but it certainly had me wondering if he was the driver when he was holding a bottle of beer in one hand." (testimony of agent Grell)); Trial Tr. 57:21-23 ("It was unusual for an individual to drive a vehicle and to hold or clutch a beer bottle in his hand after being involved in an accident. It was just unusual to me." (testimony of Star Comes Out)); Trial Tr. 85:14-16 ("From my observations it's possible that the passenger can be thrown over to the driver's side and the driver's side can be ejected [during a roll-over accident]." (testimony of Star Comes Out)).

-10-

by alcohol or marijuana, or both, and thereby caused the death of Red Star. In either case, the police could have believed that they had to act promptly to obtain evidence of Twiss's possibly intoxicated state.

Twiss argues that the FBI agent in charge of the investigation, agent Grell, did not know all of the facts that Star Comes Out did, and consequently agent Grell did not have probable cause to order the search.  What agent Grell did or did not know, however, is not relevant to the probable cause inquiry.

We have held that "probable cause [to support a warrantless search] may be based on the collective knowledge of all law enforcement officers involved in an investigation and need not be based solely upon the information within the knowledge of the officer on the scene if there is some degree of communication . . . ."  United States v. Horne, 4 F.3d 579, 585 (8th Cir. 1993) (emphasis added), cert. denied, 510 U.S. 1138 (1994); cf. United States v. Rich, 795 F.2d 680, 682 (8th Cir. 1986) ("[T]he [C]ourt does not merely look to the actual knowledge of the arresting officer, but to the combined knowledge of all the officers involved."); United States v. Rose, 541 F.2d 750, 756 (8th Cir. 1976) ("In order for an officer to have probable cause to make an arrest without a warrant it is not necessary that he have personal knowledge of all items of information which taken together constitute probable cause.  The court looks to the collective knowledge and information of all the officers involved.").

In Twiss's case, whether agent Grell knew the results of Star Comes Out's interviews with Twiss and Ross before agent Grell ordered the urinalysis was a point of dispute.  However, no one disputes that Star Comes Out had described the accident scene to agent Grell before agent Grell ordered the urinalysis.  Thus, looking to the

collective knowledge of all the officers, probable cause existed to support the warrantless urinalysis.

### III.

Twiss argues that the district court erred by failing to suppress Twiss's confession.  We disagree.

Twiss's argument is entirely premised on the impropriety of the urinalysis. Because the urinalysis was not improper, the district court did not err in refusing to suppress the confession Twiss made when he was confronted with the results of the urinalysis.

**IV.**

For the foregoing reasons, we affirm the decision of the district court.

JOHN R. GIBSON, Circuit Judge, dissenting.

I respectfully dissent.

There was no probable cause to justify this search. The court's finding of probable cause rests solely on speculation, rather than on the collective knowledge of law enforcement officials. We make an independent de novo review of the ultimate question of probable cause to make a warrantless search. See Ornelas v. United States, 116 S. Ct. 1657, 1663 (1996). We review for clear error, however, findings of historical fact and give "due weight to inferences drawn from those facts" by local law enforcement officers. See id. As we deal with a warrantless search, the burden of proof is on the government. See Turk v. United States, 429 F.2d 1327 (8th Cir. 1970); see also United States v. Marshall, 986 F.2d 1171, 1173 (8th Cir. 1993).

FBI Agent Grell made the decision that a urine sample should be obtained from Twiss.

-14-

The court supports its finding of probable cause on evidence of alcohol and marijuana which authorities found at the accident scene.  Star Comes Out, who was the only testifying witness who had investigated the scene of the accident, however, testified that there was no physical evidence linking the drugs to Twiss.  The court also

supports its finding of probable cause on the suspicion that Red Star had not been driving.  Star Comes Out, however, stated that there was no physical evidence at the scene that anyone other than Red Star had been driving the vehicle.  The position of Red Star's body near the driver's seat, combined with the fact that Red Star had a family relationship with the owner of the Jeep, made it unlikely that anyone other than Red Star was driving.

Finally, the court relies on Star Comes Out's interview of Twiss and Ross in support of its finding of probable cause, though the court acknowledges the disputed testimony concerning the timing of the interview in relation to the urinalysis.  In discussing this discrepancy the court states that Star Comes Out was confused as to whether he interviewed Twiss and Ross before or after the second call to Grell, and that he testified that he told Grell that both Twiss and Ross appeared intoxicated during the interview.  Although Grell testified that Star Comes Out told him that Star Comes Out had interviewed Twiss, who appeared to be intoxicated during the interview, Star Comes Out's testimony, which is the most direct and probative evidence, plainly does not support this.  In fact, the transcript of Star Comes Out's testimony demonstrates that he made no assertion that he interviewed Twiss before his second phone call to Grell.  Further, the record shows Star Comes Out did not interview Twiss before his second call to Grell.

Star Comes Out testified that he went to the hospital to interview the survivors, but was not able to talk to

-16-

any of them both because the hospital emergency staff was assisting them and relatives were coming in. He stated that he then went back to the jail without discussing the accident with anybody at the hospital at that time. Star Comes Out testified that before his second contact with Grell he was not able to speak with anybody about the incident with the possible exception of a Harold Brewer, a person at the emergency room that evening. This testimony is in stark contradiction to the court's finding today, and shows that Star Comes Out did not interview Twiss before his second phone call to Grell.

Star Comes Out also testified that he only had one interview with Twiss and that he prepared a written report following this interview. Star Comes Out testified that at the time of this interview he "didn't know . . . if the urine test was taken or not." Twiss's attorney asked Star Comes Out whether this interview occurred about 11:20 p.m., and Star Comes Out responded that he could not remember.[4] Authorities took Twiss's urine sample at 10:00 p.m. Therefore Grell, in making his decision to order urine samples, could not have relied upon Star Comes Out's observation that Twiss was intoxicated during the interview. Accordingly, the court's reliance on Star Comes Out's interview of Twiss for its probable cause determination is not supported by the record.

Further, and most significantly, Grell testified that he received the first call from Star Comes Out at approximately 9:45 p.m. and had the second conversation with Star Comes Out a minimum of an hour later. The authorization to give the urine test was given by Grell to Star Comes Out in this second call. The evidence thus

---

[4]Although Twiss's counsel questioned Star Comes Out about this report, the written report was not formally introduced into evidence. Twiss, however, discussed the report in, and appended the report to, his brief on appeal to the district court, as well as to this court. Though we do not normally consider evidence not in the record below, we simply observe that the report confirms that Star Comes Out's only interview of Twiss occurred at 11:20 P.M. We may consider this evidence simply for the purpose of clarifying the record. See Dakota Indus., Inc. v. Dakota Sportswear, Inc., 988 F.2d 61, 63-64 (8th Cir. 1993). Because authorities took Twiss's urine sample at 10:00 P.M., Star Comes Out thus interviewed Twiss one hour and twenty minutes after the drug test.

demonstrates that Grell's authorization was given after the urinalysis had been taken at 10 p.m.

Star Comes Out did not smell marijuana when he talked to Twiss in the hospital, and Officer Lionel Iron Moccasin gave similar testimony.

Grell asked for a urine test rather than a blood test, although generally blood alcohol tests were ordered for determining the amount of alcohol in someone's system. He has never taken blood tests to determine the presence of marijuana or other drugs, but generally urine tests are used for this purpose. Grell wanted the urine sample taken in this case to determine the presence of marijuana, but also to determine the presence of alcohol. Grell knew that a blood test would only tell him the presence of marijuana in the system, but couldn't quantify it, whereas a urine test would give him this information.

Star Comes Out testified that one bag of marijuana was found in Red Star's pocket, and one bag in a sports bag which had mail in it addressed to Robert Martin, the owner of the car. This information was not related to Grell. As the court recognizes today, however, it is the collective knowledge of the officers that is material, and this must apply to exculpatory evidence, and defeats a conclusion of probable cause.

The court today strives mightily to establish probable cause, but the word "probable" stands in stark contradiction to the words found on pages 6 and 7 and particularly footnote 3 of the court's opinion, such as "suspected"; which "suggested that Twiss could have been the driver"; "Twiss was likely intoxicated, which was consistent with drug and alcohol use"; "I suppose"; "It was just unusual to me"; and "It's possible that the passenger can be thrown over the driver's side and the driver's side can be ejected." (Emphasis added)

From these statements the court finds it probable that Twiss could have been using marijuana while a passenger in the Jeep and police could have believed that he was the driver while intoxicated, either by alcohol or marijuana or both, and caused the death of Red Star. Probable cause is not so elastic or imaginative a standard or concept, and the burden was on the government.

In light of this evidence I conclude the Magistrate Judge properly ruled that there was no probable cause to justify this warrantless search and that the results of the test must be suppressed. Further, there was evidence that Twiss made the incriminating statements after Grell confronted him with the results of the test. Therefore, under the fruit of the poisonous tree doctrine, the incriminating statements must also be suppressed. <u>See</u> <u>United States v. Carter</u>, 884 F.2d 368, 374 (8th Cir. 1989).

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

-22-