STATE of Minnesota, Respondent,

v.

Wintersun LEMIEUX, Appellant.

No. A05–554.

Supreme Court of Minnesota.

Jan. 18, 2007.

John Stuart, State Public Defender, Davi E. Axelson, Asst. Public defender, Minneapolis, MN, for Wintersun Lemieux, Appellant.

Lori Swanson, Atty. Gen., Thomas R. Ragatz, Asst. Atty. Gen., St. Paul, MN, Melanie Sue Ford, St. Louis County Atty., Duluth, MN, for the State, Respondent.

# O P I N I O N

ANDERSON, RUSSELL A., Chief Justice.

Appellant Wintersun Lemieux was convicted and sentenced in St. Louis County District Court for the crime of first-degree murder in connection with the death of 68–year–old Irwin Teitelbaum. On appeal, Lemieux challenges the admission of evidence as having been derived from an illegal warrantless entry into his residence. Concluding that the entry was justified under the emergency-aid exception to the warrant requirement, we affirm.

Teitelbaum lived with his wife at 3 East 13th Street in the Harbor View housing complex in Duluth. The housing complex consisted of multi-unit homes, somewhat similar to condominiums with separate entrances and no common hallway. Teitelbaum delivered newspapers for the *Duluth News–Tribune* for some 15 years, having taken over the route from his sons. As a matter of routine, he would pick up the bundle of newspapers as soon as they were delivered. On July 9, 2003, when Teitelbaum's wife woke up, neither Teitelbaum nor the newspapers were there. She looked out the front window, saw her husband lying motionless on his back with blood all over his face, and called 911. The call came in to dispatch at 6:15 a.m.

Responding officers found Teitelbaum's body on the sidewalk. He had sustained massive trauma to the head, and there was blood on his clothes and a nearby canvas newspaper bag. He had been disrobed, except for a sock on one foot, and his clothes were scattered around the yard.

Around 6:40 a.m., shortly after the officers cordoned off the area with crime scene tape, one of the officers saw Lemieux riding by the crime scene in a USA minivan taxi.[1] The officer called the cab company and found out that the minivan taxi's fare had originated from 729 West 4th Street. Officers canvassed the area in the "line of sight" of the homicide, but came away with nothing pertinent.

The officer in charge of the investigation, Lieutenant Robert Brasel, convened a major-crime briefing at 10:30 a.m. to discuss what they knew and to "brainstorm" and prioritize what needed to be done. During the meeting, Tawnya Rainey's name was mentioned. Rainey resided at 15 East 13th Street, about a half block from the crime scene. Rainey was frequently gone from the residence during the summer but would still "pop in and out," and she also allowed others to stay there so there was a lot of "traffic" through that residence. The officers had previously had problems with that residence, including some criminal behavior; but because Rainey continued to pay the rent, they felt somewhat constrained in what they could do about it. Lieutenant Brasel decided to have an officer go to 15 East 13th Street in an effort to make contact with Rainey or any other occupants of the residence; he assigned that task to Sergeant Jon Haataja, specifically directing that if nobody was home, no officer was to enter the residence without talking to him (Brasel) first.

Meanwhile, Officer Shana Harris, who was among the first to arrive at the Teitelbaum crime scene but missed the briefing in order to complete her report, returned to Harbor View to do her own canvassing, intending to contact people she knew to see if they could provide any information on the homicide. She asked the Harbor View housing specialist, Susan Jordan, about problem residences, and Jordan brought up Rainey's name. Officer Harris was familiar with Rainey and had already tried calling her, but Rainey's phone number had been disconnected. After speaking with Jordan, Harris drove to 15 East 13th Street to do a "knock and talk" with Rainey or anyone else at that residence.

Sergeant Haataja and Officer Harris arrived at 15 East 13th Street at about the same time. When the officers approached the front of the residence, they saw that the screen on the window to the right side of the door had been torn loose, the window had been pushed up, and the door was "slightly open, not latched." They could hear music playing inside, and a CD sounded like it was skipping. Haataja began pounding on the door loud enough to be heard over the music as Harris shouted out Rainey's name, calling for her to answer the door. While this was going on, a neighbor from the adjacent dwelling stepped out and told Harris that he had heard someone inside 15 East 13th Street singing "that night." The officers were concerned that a burglary had occurred. Around noon, approximately 14 minutes after the officers' arrival, Haataja called Lieutenant Brasel to report what they had observed. Brasel told them to call for backup and to do a "health and welfare" check for possible injured occupants, emphasizing that they were looking for injured persons, not searching or doing anything else. Part of the reason Haataja was given this assignment was that Brasel knew Haataja "understood that."

Sergeant Haataja and Officer Harris, joined by two other officers, entered the residence with their firearms drawn and did a quick sweep of the floors, "clearing" the rooms as they moved through. As

1. The Duluth police officers were familiar with Lemieux from prior contacts.

Haataja walked through the kitchen after checking the back door to make sure it was locked, he saw Teitelbaum's electronic benefit transfer (EBT) card in plain view. After the sweep-search, the residence was secured and a search warrant obtained. While Haataja was guarding the back entrance pending the arrival of the search warrant and trying to be of more use, he called Lemieux's probation officer to see if he had an address for Lemieux. Meanwhile, as Harris was guarding the front entrance, the neighbor told her that Lemieux had been staying at the Rainey residence. During the execution of the search warrant, police officers found blood smears, that were later determined to match Teitelbaum's DNA profile, underneath the exterior window and inside on the banister leading to the basement; miscellaneous items belonging to Teitelbaum below the interior window sill; and a credit union envelope, that contained $180 in cash, with Lemieux's and Teitelbaum's fingerprints.

In their investigation, police officers learned that the USA minivan taxi that drove by the crime scene on July 9, 2003, had picked up Lemieux from 729 West 4th Street at 6:35 a.m. Lemieux gave the driver $3 in change, wanted to go to Harbor View, and asked whether the driver had heard "if anything exciting" was "going on." The driver dropped off Lemieux shortly after driving by the crime scene because the cab fare meter had gone beyond the amount of money he had given her.

The police also learned that Lemieux showed up at 729 West 4th Street in the early morning hours of July 9, 2003. He was alone, "pretty frantic, breathing hard," and holding a baseball bat. He had blood on his hands and his clothes. He asked the resident, Tracy Wentland, for a change of clothes, and she showed him where an ex-boyfriend had left some clothing. Lemieux left his own clothing in a garbage bag in Wentland's basement. He told Wentland "the whole story": that he had hit somebody with the baseball bat, that the man was dead, and that he took the man's clothing off and threw it in the garbage. Wentland called a cab and gave Lemieux $3 in change for the cab fare. During a warranted search of Wentland's residence, police officers found Lemieux's clothing and a baseball bat. Forensic testing of the clothing yielded profiles matching Teitelbaum's DNA; and the bat had DNA matching Lemieux's profile on the shaft and Teitelbaum's profile on the tip.

Lemieux was arrested in the afternoon of July 9, 2003; and following a *Miranda* waiver, Lieutenant John Beyer questioned him about his activities over the previous 24 hours. Lemieux said that he had been staying at Rainey's residence, and that on July 8 he got up at 5 p.m., went downtown, and started drinking. He returned to the residence around 11:30 p.m. He said that he did not have a key, but the door was unlocked. He continued to drink and fell asleep. He denied hurting or fighting with an older man in the Harbor View area but admitted slapping and kicking somebody who was in his mid-twenties. Lemieux wanted to know how his name "[came] up in this;" and when told that his name came up because he was in a cab that morning, he said, "So you have got me in here over that?" The next day, the officer told Lemieux that he was going to be charged with second-degree murder and that a grand jury would be convened to seek first-degree murder charges. Lemieux responded, "That's not right, it wasn't premeditated."

Lemieux was indicted by grand jury for first-degree premeditated murder, first-degree felony murder, and second-degree murder, in violation of Minn.Stat.

§§ 609.185(a)(1), (a)(3), and 609.19, subd. 1(1) (2004). While awaiting trial, Lemieux told the police that they "wouldn't have to go through all of this if [they] would just get him a better deal." Lemieux went on to say, "I'm not saying I didn't do it, but you need to get me a better deal." When asked what he meant by a "better deal," Lemieux said, "Something other than first-degree."

Before trial, Lemieux moved to suppress the evidence discovered during the warrantless sweep-search of 15 East 13th Street, and all evidence derived from that search. Following a three-day omnibus hearing, the district court denied the motion, concluding that the warrantless entry was justified under the emergency-aid exception to the warrant requirement. At trial, in addition to evidence from the search, the state presented the physical evidence and forensic analysis of the evidence collected from 729 West 4th Street; and also evidence from the crime scene, including Lemieux's bloody thumbprint on top of the bundle of newspapers, a water bottle with Lemieux's fingerprints and DNA, and miscellaneous papers with bloody shoe prints similar to the treads on Lemieux's shoes. There were also Lemieux's police statements. The resident from 729 West 4th Street testified about Lemieux's confession made in the early morning hours of July 9, 2003, and the taxi driver testified about picking up Lemieux from that residence and driving him by the crime scene. The medical examiner testified that Teitelbaum's death was caused by blunt-force trauma to the head and neck region, and that he died relatively quickly after the attack started. Witnesses for the defense included a Harbor View resident who, at around 4 a.m. on July 9, 2003, heard people arguing near the Teitelbaum residence; she could not see them, but estimated there were three men. Another Harbor View resident testified that at

around 4:50 a.m. on that date, she saw a shirtless, "gangly" young man crashing through the bushes. She saw only one person and did not hear anything like an argument. The jury found Lemieux guilty as charged, and he was committed to the custody of the Commissioner of Corrections for the mandatory life term.

■ On appeal from the judgment, Lemieux challenges the admission of evidence derived from the warrantless sweep-search of 15 East 13th Street.

■ When this court reviews a trial court's order following an omnibus hearing, determinations of reasonable suspicion and probable cause as they relate to searches and seizures "should be reviewed de novo on appeal." *State v. Lee*, 585 N.W.2d 378, 382–83 (Minn.1998). The district court's findings of fact should be reviewed for clear error. *Id.* at 383.

■ The Fourth Amendment and Article I, Section 10 of the Minnesota Constitution guarantee individuals the right to be free from unreasonable searches and seizures by the government. "It is a 'basic principle of Fourth Amendment law,' that searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 586, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980) (footnote omitted). " '[A]t the very core' of the Fourth Amendment 'stands the right of a man to retreat into his own home.' " *Soldal v. Cook County*, 506 U.S. 56, 61, 113 S.Ct. 538, 121 L.Ed.2d 450 (1992) (quoting *Silverman v. United States*, 365 U.S. 505, 511, 81 S.Ct. 679, 5 L.Ed.2d 734 (1961)). Nevertheless, the warrant requirement is subject to certain limited exceptions, and law enforcement officers, in pursuing a community-caretaking function, "may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occu-

pant from imminent injury." *Brigham City v. Stuart*, — U.S. —, 126 S.Ct. 1943, 1947, 164 L.Ed.2d 650 (2006); *see also State v. Othoudt*, 482 N.W.2d 218, 223 (Minn.1992).

■ In applying the emergency-aid exception to the warrant requirement, two principles must be kept in mind: first, that the burden is on the state to demonstrate that police conduct was justified under the exception; and second, that an objective standard should be applied to determine the reasonableness of the officer's belief that there was an emergency. *Othoudt*, 482 N.W.2d at 223.[2] In determining whether an emergency justified a warrantless entry, a number of courts had followed a three-prong test articulated in *People v. Mitchell*, 39 N.Y.2d 173, 383 N.Y.S.2d 246, 347 N.E.2d 607, 609 (1976):

> (1) The police must have reasonable grounds to believe that there is an emergency at hand and an immediate need for their assistance for the protection of life or property.
>
> (2) The search must not be primarily motivated by intent to arrest and seize evidence.
>
> (3) There must be some reasonable basis, approximating probable cause, to associate the emergency with the area or place to be searched.

*See, e.g., United States v. Cervantes*, 219 F.3d 882, 888 (9th Cir.2000); *People v. Hebert*, 46 P.3d 473, 479–80 (Colo.2002);

*see* John F. Decker, *Emergency Circumstances, Police Responses, and Fourth Amendment Restrictions*, 89 J. Crim. L. & Criminology 433, 532–33 (1999) (proposing a three-prong test as an aid in evaluating justification under the emergency-aid exception). Brigham City, however, rejected the second prong, the subjective motivations of the officers. 126 S.Ct. at 1948 (stating that the officer's subjective motivation is irrelevant for Fourth Amendment purposes).

■ "But a warrantless search must be 'strictly circumscribed by the exigencies which justify its initiation' * * *." *Mincey v. Arizona*, 437 U.S. 385, 393, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978) (quoting *Terry v. Ohio*, 392 U.S. 1, 25–26, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). Any search of a residence following a warrantless entry must be "limited by the type of emergency involved. It cannot be used as the occasion for a general voyage of discovery unrelated to the purpose of the entry." *United States v. Moss*, 963 F.2d 673, 678 (4th Cir.1992) (holding that even if original entry of cabin had been justified under the emergency-aid exception, search of defendant's backpack for identification was unreasonable). *See also Cervantes*, 219 F.3d at 891–92 (holding initial entry of apartment to locate methamphetamine lab under the emergency exception was justified, but subsequent entry by investigator was not, given that "the risk of explosion had been defused").

---

**2.** Professor LaFave observes that when evaluating emergency-aid searches, courts will ask whether there were reasonable grounds to believe that some kind of an emergency existed, that is, whether there is evidence that would lead a prudent and reasonable official to see a need to act. The officer must be able to point to specific and articulable facts which, taken with rational inferences from those facts, reasonably warrant that intrusion. But * * * this probable cause requirement, must be applied by ref-

erence to the circumstances then confronting the officer, including the need for a prompt assessment of sometimes ambiguous information concerning potentially serious consequences. As one court usefully put it, the question is whether the officers would have been derelict in their duty had they acted otherwise.

3 Wayne R. LaFave, *Search and Seizure* § 6.6(a), at 452–53 (4th ed. 2004) (citations and internal quotation marks omitted).

When assessing the reasonableness of an emergency-aid search, the officer who conducts the search is imputed with knowledge of all facts known by other officers involved in the investigation, as long as the officers have some degree of communication between them. *See United States v. Twiss*, 127 F.3d 771, 774 (8th Cir.1997); *see also State v. Riley*, 568 N.W.2d 518, 523 (Minn.1997) (using collective-knowledge approach to analyze a warrantless arrest). Actual communication of information to the officer conducting the search is unnecessary. *See Twiss*, 127 F.3d at 774.

Here, Lieutenant Brasel testified that he sent Sergeant Haataja to 15 East 13th Street to make contact with anyone using the premises; and Officer Harris testified that she, on her own volition, decided to go to that residence to do a "knock and talk." While Haataja testified that he was there to do a "welfare check," the record is not entirely clear as to what he meant by that; but in any event, he adhered to his instructions not to enter the premises without authorization. The district court found that the officers' purpose in going to the residence was to find out if persons using the premises might have seen or heard something useful to the ongoing homicide investigation and not to gain entry to search for evidence. But once the officers were at the residence, they noted that the window screen was torn loose, the window was pushed up, the door was unlatched, and there was music inside that was skipping; the officers announced their presence, pounded loudly on the door[3] and yelled for someone to answer the door, and they learned that someone had been in the residence that night. The officers were concerned about a "forced entry situation" or burglary and obtained limited authorization for immediate entry to look for possible victims.

Burglary of a dwelling is not "deemed a purely property offense because * * * such an offense always carries with it the possibility of violence and therefore some special risks to human life." *State v. Nunn*, 297 N.W.2d 752, 754 (Minn.1980). Other courts have concluded that police entry is justifiable under the emergency-aid exception where police have reasonable grounds to believe that a burglary is in progress or has recently occurred. *See, e.g., United States v. Lenoir*, 318 F.3d 725, 730–31 (7th Cir.2003) (upholding warrantless entry where defendant who was carrying two high-powered rifles fled from police into nearby home but had trouble entering the door and police reasonably feared for the safety of the home's occupants); *United States v. Tibolt*, 72 F.3d 965, 970–71 (1st Cir.1995) (upholding warrantless entry on reasonable, though mistaken, belief that residence was the source of security alarm); *Murdock v. Stout*, 54 F.3d 1437, 1441–42 (9th Cir.1995) (upholding warrantless entry during investigation of suspected burglary, where facts known to police indicated that resident was not responding and circumstances suggested that resident should have been present); *Carroll v. State*, 335 Md. 723, 646 A.2d 376, 384 (1994) (upholding warrantless entry based on open door, a broken window pane, and information that the resident was away and not expected to return for a day or two); *see generally* 3 Wayne R.

---

3. Haataja's pounding on the door caused it to swing open a few inches, and he could see at an angle into the living room, which looked like it had been ransacked. The district court found that the officer's pounding was improperly calculated to open the door, but also found that Harris properly viewed the interior through the front window. In this appeal, the state concedes that the latter finding was clearly erroneous and that what the officers saw through the open door may not be used to support the entry into the residence.

LaFave, *Search and Seizure* § 6.6(a), at 459–61 (4th ed. 2004) (stating that entry is reasonable "to seek possible victims of violence in premises apparently burglarized recently"); Decker, *supra* at 490 (stating that "[m]ost courts have applied the emergency doctrine in circumstances where police reasonably believe that a burglary is in progress or has recently occurred").

Furthermore, here the apparently burglarized residence was in close proximity to a brutal and seemingly random homicide. Ultimately, it was determined that the perpetrator entered the residence through the window: the victim's blood was under the window on the exterior wall of the residence, the victim's belongings were inside under the window sill, and, in closing arguments, counsel for both parties acknowledged that the perpetrator gained entry through the window. That the officers later learned Lemieux had entered his own abode is of no moment: "what matters is their reasonable belief" that a burglary was in progress or had recently occurred at the time of the entry. *In re Sealed Case*, 153 F.3d 759, 765 (D.C.Cir. 1998).

The officers' search was also limited to the scope of the emergency, sweep-searching the floors for the presence of intruders or injured occupants and departing immediately upon finding the residence unoccupied. And assuming that the officers' subjective motivations are a relevant state-law consideration, a warrantless search conducted during a criminal investigation does not necessarily preclude application of the emergency-aid exception so long as one of the motives for the warrantless search corresponds to an objectively reasonable emergency. *See, e.g., Cervantes*, 219 F.3d at 891 (concluding that officer making warrantless entry to locate a methamphetamine lab during criminal investigation was primarily motivated by concern for the safety of the apartment building's occupants, as evidenced by the officer's order that the tenants turn off open flames and evacuate the building); *see also* Decker, *supra* at 511–16 (discussing subjective-motivation element). Here, the officers' warrantless entry was primarily motivated by concern of a burglary in progress, as evidenced by the call for backup and entry with firearms drawn.[4]

In conclusion, we hold that the police entry of the residence in close proximity to a brutal and seemingly random homicide was justified under the emergency-aid exception to the warrant requirement because the officers had reasonable grounds to believe that a burglary was in progress or had recently occurred, the entry was motivated primarily to look for possible victims, and the scope of the search was limited to the emergency.

Affirmed.

MEYER, Justice (dissenting).

I respectfully dissent. I would not require that an emergency-aid search be supported by evidence establishing proba-

---

**4.** The dissent suggests that the warrantless entry to investigate a burglary was a pretext for a warrantless search for evidence of the homicide. In fairness to the investigating officers, as previously indicated, the district court found that the officers' purpose in going to the residence was to talk to whomever might be there and not to gain entry. But it was the circumstances confronting the officers at the residence that caused their concern as to the need for immediate entry. Officer Haataja testified that "based on the things that we [saw] there," there was concern that a burglary occurred. Lieutenant Brasel did not provisionally order an emergency-aid search before the officers' arrival; instead, he testified that he directed the officers "to make contact with the residents, and I specifically directed that absolutely nobody—if nobody was home—that nobody was going into that apartment without talking to me first, that I was going to make that decision."

ble cause to believe an emergency exists at a particular location, and instead I would inquire whether the emergency-aid search was based on a reasonable belief supported by specific and articulable facts. I disagree with the majority's conclusion that the facts of this case give rise to an objectively reasonable belief that an emergency-aid search was justified. Finally, I would conclude that the evidence obtained as a result of that search was improperly admitted, prejudicing defendant Wintersun Lemieux as to two of the three counts against him.

The Minnesota Constitution provides that:

> The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures shall not be violated; and no warrant shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the person or things to be seized.

Minn. Const. art. 1, § 10; *cf.* U.S. Const. amend. IV. This constitutional guarantee renders warrantless searches per se unreasonable, subject to limited exceptions. *State v. Othoudt,* 482 N.W.2d 218, 222 (Minn.1992) (citing *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967)). This "per se unreasonable" principle applies with *greatest* force when it is a home that is to be invaded, as "[c]ourts are particularly reluctant to find exceptions to this rule in the context of a warrantless search or seizure in a home." *Id.* (citing *Payton v. N.Y.,* 445 U.S. 573, 586, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980)). Despite this reluctance, we have recognized an exception to the warrant requirement in the context of an emergency, stating that "[t]he police may enter a dwelling without a warrant if they reasonably believe that a person within is in need of

emergency aid." *Id.* at 223. For an emergency-aid search to be justified, the search must be objectively reasonable. *Id.* (citing *Root v. Gauper,* 438 F.2d 361, 364 (8th Cir.1971)). "The court should ask whether with the facts available to the officer at the moment of the * * * search, would a person of reasonable caution believe that the action taken was appropriate." *Id.* The state has the burden of showing that the emergency exception applies. *Id.*

As an initial matter, the majority appears to establish a new test for the emergency-aid exception to the prohibition on unreasonable searches, apparently holding that the facts known to law enforcement officers must establish probable cause to associate the area to be searched with an emergency. *State v. Lemieux, supra,* at 788. I believe the court errs in indicating that the probable cause standard applies in the emergency-aid search context. Application of the probable cause standard would be a departure from our case law on emergency-aid searches. *See, e.g., Othoudt,* 482 N.W.2d at 223 (requiring only a reasonable belief in the need to provide emergency aid); *see also* 3 Wayne R. LaFave, *Search and Seizure* § 6.6(a), at 452–53 (4th ed. 2004). More importantly, the probable cause standard, arguably approaching a more-probable-than-not level, is too high. Society needs law enforcement officers, when legitimately acting in their roles as first responders rather than criminal investigators, "*to act,* not to speculate or meditate" on whether the proper legal standard has been met; "[p]eople could well die in emergencies if police tried to act with the calm deliberation associated with the judicial process." *See Wayne v. United States,* 318 F.2d 205, 212 (D.C.Cir. 1963). Consequently, instead of applying the probable cause standard, I would require that an emergency-aid search be based on a reasonable belief, supported by specific and articulable facts, that a need

to render emergency aid justifies the resulting intrusion. *See Othoudt*, 482 N.W.2d at 223; *cf. Terry v. Ohio*, 392 U.S. 1, 21, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); 3 LaFave, *supra* § 6.6(a), at 452–53. This standard certainly requires less proof than that sufficient to establish a preponderance of the evidence, *cf. United States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989), but it protects liberty interests from arbitrary infringement by requiring a specific factual basis and certainty beyond a mere hunch. In addition, because the state bears the burden of justifying an emergency-aid search and because meritless and opportunistic cries of "emergency!" should not permit officers acting as criminal investigators to evade the requirement of a warrant based on probable cause, a court gauging the propriety of an emergency-aid search should give full and fair scrutiny to all available facts.

Even though the majority apparently applies the higher probable cause standard, it nevertheless determines that it was objectively reasonable for officers to believe a person inside Tawnya Rainey's house may have needed emergency aid. In support of this conclusion, the majority cites the possibility that Rainey's house had been burglarized, potentially by Teitelbaum's murderer. Evidence for this includes the skipping music, the torn screen in an open window, an unlatched front door, the failure of anyone to answer the door, statements by a neighbor indicating that someone had been home the night before, and the house's proximity to the earlier "brutal and seemingly random" homicide.[1]

I disagree that the facts of this case satisfy the state's burden of establishing that the search was objectively reasonable, even under a less-than-probable-cause standard. The music and reports of possible occupants are certainly indicative that someone had been inside the house in the recent past. But it seems odd to count the possibility that someone had been inside recently as an affirmative factor necessitating immediate entry rather than a minimum requirement that the state must prove for the search not to be deemed per se unreasonable. In addition, while a torn screen on an open window, an unlatched door, and skipping music may be somewhat unusual, the merely unusual does not indicate actual trouble, and eccentricity alone is not enough to abrogate constitutional guarantees. This is particularly true where invasion of the home is concerned. A reasonable suspicion is not just any suspicion and, accordingly, even if evidence of a burglary alone may be sufficient to justify an emergency-aid search, the

---

1. In addition, while the majority does not cite this fact explicitly in its analysis, the majority makes vague reference to some possibly crime-related "problems" supposedly linked to Tawnya Rainey's house. The majority does not explain how these ill-defined problems could have been related to Teitelbaum's murder or to any other potential cause of an emergency. Instead, at least some of these "problems" appear to have been unrelated to the emergency supposedly feared by the police. For example, Officer Harris sought out Tawnya Rainey in part because she learned that Rainey's former boyfriend had violated an order for protection at some unknown time, in some unknown place, and in some unknown manner. It is true that links to criminal activity may potentially have been reason to *investigate* Rainey's house in connection with the murder, in which case, as the majority notes, the officers would be "somewhat constrained," presumably by our constitutional protections from unreasonable search and seizure. However, it is not clear why links to criminal activity might be indicative of the need to *render emergency aid,* a scenario in which the police are "somewhat" less "constrained."

facts of this case are insufficient to sustain a reasonable belief that Rainey's house had been the subject of a random burglary.

Similarly, the facts known by the officers are not sufficient to support an objectively reasonable belief that Teitelbaum's murderer had left a second victim in need of emergency aid inside Rainey's house.[2] The majority emphasizes that Teitelbaum's murder was "brutal and seemingly random," but, while the nearby homicide is relevant to our analysis, the court neglects to explain why "brutal" murderers are more likely to kill again or how this murder appeared more random than most other homicides. In addition, six hours had passed between the homicide and the time of the emergency-aid search, which gave the murderer ample time to flee and indicated that anyone battered as Teitelbaum had been would already be dead. Most importantly, the majority points to no evidence, aside from the house's general proximity to the murder scene, connecting Rainey's house to the homicide. Viewing the circumstances as a whole, I cannot say that the facts of this case justify warrantless entry into Tawnya Rainey's house under an emergency-aid search rationale— there is both too little evidence of an emergency and too little evidence connecting

any potential emergency to Rainey's house.

While the validity of an emergency-aid search is determined by an objective test, "this court will not look kindly upon warrantless entries of family residences, justified on the flimsiest and *most pretextual* of excuses." *Othoudt,* 482 N.W.2d at 224 (emphasis added). The subjective intent of the officers, although largely unscrutinized by the majority, is unquestionably relevant. *See State v. Askerooth,* 681 N.W.2d 353, 369 n. 12 (Minn.2004) ("While not dispositive to our objective evaluation, the absence of any subjective perception of risk by [the officer] is noteworthy."). That an officer did not actually believe that an emergency-aid search was required is evidence that an emergency-aid search was not in fact objectively reasonable under those circumstances and, when courts are forced to review the facts far removed from the actual events and through second-hand accounts, such information may be of great probative value. In this case, there is ample evidence that the officers did not actually believe an emergency-aid search was required. The testimony of several officers indicates that initial police interest in Tawnya Rainey's house was related to gathering information in the course of the homicide investigation.[3]

---

**2.** To the extent that the possibility of a random burglary and *entry by Teitelbaum's* murderer are two separate reasons to conduct an emergency-aid search, the majority appears to be "summing" potential threats in a manner unprecedented in our earlier cases. Even if adding threats from separate sources in this manner satisfies the specificity requirement of our reasonable suspicion test, it is not clear whether any limiting principle would prevent the aggregation of many small possibilities of harm to satisfy the reasonableness requirement, thereby permitting police intrusion into a citizen's home without a warrant even when no single serious threat was present. Permit-

ting warrantless searches under such circumstances would both contravene our Constitution's prohibition against unreasonable searches and create an unworkable standard for police officers, citizens, and courts to apply.

**3.** For example, Officer Harris testified that her original purpose in seeking out Tawnya Rainey was to see "[i]f she could give me anything, you know, any leads, any names that maybe she thought were suspicious." Moreover, Officer Haataja's report from July 10, 2004, stated that his interest in finding

Nevertheless, an *emergency-aid* search of Rainey's house was preliminarily ordered *before* Officers Haataja and Harris arrived at the house[4] and made the observations that allegedly justified the emergency-aid search.[5] No other residence near the crime scene was the subject of similar concern from the police. Finally, the officers abandoned concern for Tawnya Rainey's welfare immediately after finding evidence that the murderer had in fact been in her house,[6] which was the very possibility that supposedly made the police fear for Rainey's safety in the first place. Rather than confirming that Tawnya Rainey was safe, the officers immediately picked up the criminal investigation upon exiting the house, if indeed the criminal investigation was ever actually abandoned.[7] This evidence of absence of good faith on the part of the police officers, while not determinative, further undermines the state's claim of objective reasonableness.

Moreover, permitting an emergency-aid search under the facts of this case would expand the exception beyond the scope previously recognized in our decisions. Tellingly, we appear to have held that an emergency-aid search of a home was proper only two times in the last 30 years. In *State v. Terrell*, we held that entry was proper when officers entered a home in response to a report that a person had

---

Tawnya Rainey was related to seeking "information relating to the ongoing investigation."

4. Lieutenant Brasel clearly contemplated warrantless entry into Tawnya Rainey's house and discovery of evidence related to the homicide when he ordered Officer Haataja to visit the house, testifying that "I realized that if we entered an apartment without a warrant and we did find—although, at that point, it was a big 'if'—* * * evidence of a homicide, that there would be an argument made to suppress that evidence." Moreover, Lieutenant Brasel also testified that he sent Officer Haataja to make contact with Tawnya Rainey *precisely because* he wouldn't exceed the permitted scope of an emergency-aid search, which might cause evidence to be excluded. Officer Haataja testified that he was sent "[t]o conduct a welfare check for the resident who lived there" and that "[i]t was my intent to attempt to contact this Tawnya Rainey and to verify that she was—her health and welfare w[ere] okay."

5. Lieutenant Brasel testified that he had insufficient evidence to order an emergency-aid search before Officers Haataja and Harris arrived at the house.

6. After he found Teitelbaum's bank card, Officer Haataja ordered everyone out of the house and posted guards at the front and back doors to protect the scene until a proper search warrant could be obtained. Officer

Haataja then called a parole officer to check on Wintersun Lemieux's whereabouts. Officer Harris left the house and engaged Tawnya Rainey's neighbor in a conversation about the neighbor's upcoming camping trip; this conversation lasted "quite some time." Officer Harris did eventually call Lisa Rainey, Tawnya Rainey's sister, but Officer Harris did not ask Lisa Rainey about how to contact Tawnya Rainey. While Officer Harris did apparently ask Lisa Rainey to contact Tawnya Rainey herself, Officer Harris's primary concern in the phone call was related to learning where Wintersun Lemieux could be found. *Id.* While Officer Mike Erickson did eventually learn that Tawnya Rainey was busy attending a powwow and not staying in her house, he failed to mention this to other officers or include it in his report despite the alleged concern for Tawnya Rainey's welfare.

7. Officer Mike Erickson testified that he was aware of some connection between the Rainey family and Wintersun Lemieux prior to the major crime briefing held at 10:30 a.m. This, along with Officer Haataja's attempts to immediately track down Lemieux after finding evidence related to the homicide in Tawnya Rainey's house, supports the possibility that the entire visit to Tawnya Rainey's house was motivated by an interest in investigating Wintersun Lemieux specifically rather than in investigating the homicide more generally.

been shot and when the officers subjectively believed that the victim might still be alive. 283 N.W.2d 529, 532 (Minn.1979). In *State v. Bradford,* we held that entry was lawful in response to a 911 call reporting that a woman had shot herself. 618 N.W.2d 782, 787, 795 (Minn.2000). In both cases, the evidence was supplied by persons requesting police assistance and indicated a much greater probability of a specific and actual emergency compared to the case now before the court.[8]

The majority cites several foreign cases for the principle that a reasonable belief that an illicit entry has occurred is enough to establish a reasonable belief that someone inside may need emergency care, but, under closer scrutiny, none of these cases support a finding of objective reasonableness in this case. In *United States v. Tibolt,* the police officers *were called to a residence* by a security company *in response to a security alarm,* no one in the house responded to phone calls or on-site efforts to contact occupants, and the officers arrived *within ten minutes* of activation of the alarm. 72 F.3d 965, 970 (1st Cir.1995). Most importantly, no direct challenge to the objective reasonableness of the search appears to have even been made on appeal. *Id.* n. 3. In *Murdock v. Stout,* police were *summoned* by a neighbor who *had actually seen someone run from a neighbor's house,* and officers entered only after finding an *open* door and evidence that someone was home but nonresponsive. 54 F.3d 1437, 1439 (9th Cir. 1995). Moreover, the *Murdock* court "ob-

serve[d] that there was no indication here that the officers were using their burglary investigation as a pretext for conducting a search for evidence in Murdock's house." *Id.* at 1442–43. In *United States v. Lenoir,* the police received a call about a disturbance involving an armed man. 318 F.3d 725, 727 (7th Cir.2003). The responding officers arrived to find a visibly drunk man gripping an assault rifle and a shotgun, and the officers followed him when he fled into a nearby house. *Id.* Finally, in *Carroll v. State,* 335 Md. 723, 646 A.2d 376 (1994), the court emphasized the importance of determining whether the officers were "using the situation as an excuse to conduct an unlawful search for evidence," *id.* at 382, and, in contrast to the present case, the court ultimately found that there was no evidence in the record indicating that the officers "entered \* \* \* for any reason other than to investigate the suspicious condition." *Id.* at 385. These cases all involve additional factors—factors such as third parties requesting help, stronger connections between the anticipated dangers and the suspected victims or suspected locations, apparent good faith on the part of the investigating officers—that distinguish them from the present situation.

While we review the legality of the search de novo, I agree with the district court that, without admissible evidence of the house's interior being in a state of disarray, the emergency-aid search was unjustified. The remaining evidence of an emergency, including the officers' apparent

---

8. Moreover, we have held emergency-aid searches to be improper even when an emergency actually appeared to exist but was being attended to by medical professionals, *Othoudt,* 482 N.W.2d at 223, and when police were summoned by an informant's report that an occupant "may need help," *State v. Fitzger-*

*ald,* 562 N.W.2d 288, 288 (Minn.1997) (holding that entry was unlawful as it was based on one-day-old information and the circumstances generally did "not suggest the kind of emergency that would justify a warrantless entry").

failure to subjectively believe that Tawnya Rainey might need aid, is too weak for entry to have been objectively reasonable. Moreover, application of the exception in this case would be out of line with other emergency-aid decisions and would impermissibly erode constitutional protections from warrantless searches in the very context where they should be the strongest—in one's home.

Because the emergency-aid search of Tawnya Rainey's house was improper and because information from that search formed the basis for the search warrant under which evidence against defendant Lemieux was recovered, the evidence from Rainey's house should not have been admitted at trial. *See State v. Nelson,* 355 N.W.2d 134, 137 (Minn.1984). Therefore, it is necessary to determine whether the verdicts against Lemieux were surely unattributable to the erroneously admitted evidence—in other words, that the error was harmless beyond a reasonable doubt. *See State v. Juarez,* 572 N.W.2d 286, 292 (Minn.1997). The evidence obtained from Rainey's house was the strongest evidence against Lemieux regarding robbery and, consequently, premeditation. While the evidence that Lemieux murdered Teitelbaum is overwhelming, without the evidence from Rainey's house, the evidence of robbery and premeditation is not, and inclusion of the improperly recovered evidence was not harmless beyond a reasonable doubt. Therefore, I would affirm Lemieux's conviction for second-degree intentional murder but reverse his convictions for first-degree murder and for first-degree murder while committing aggravated robbery.

PAGE, Justice (concurring in part, dissenting in part).

I join Justice Meyer's dissenting opinion except as to her conclusion that an emergency-aid search may be justified by mere reasonable suspicion. While I agree with the court that the higher probable cause standard applies to emergency-aid searches, for the reasons stated in Justice Meyer's dissent, the facts of this case fail to establish reasonable suspicion, much less probable cause.